**TITLE INSURANCE & GUARANTY CO. et al. v. HART.**

No. 11261.

Circuit Court of Appeals, Ninth Circuit.

Jan. 8, 1947.

As Amended March 24, 1947.

DENMAN, Circuit Judge, dissenting.

Edward F. Treadwell and Luther Elkins, both of San Francisco, Cal., Arthur J. Edwards, of Los Angeles, Cal., and Thomas E. Palmer, of San Francisco, Cal. (H. R. Cooke, of Reno, Nev., of counsel), for appellants.

James T. Boyd, of Reno, Nev., for appellee.

Chester C. Kempley, of Los Angeles, Cal., for stockholders.

Roger S. Foster, Sol., SEC., Theodore L. Thau, Sp. Asst. to Sol., Aaron Levy, Atty., SEC., all of Philadelphia, Pa., and W.

Stevens Tucker, Atty., SEC., of San Francisco, Cal., for Securities & Exchange Commission.

Before DENMAN, HEALY, and ORR, Circuit Judges.

ORR, Circuit Judge.

Mount Gaines Mining Company petitioned the United States District Court for the District of Nevada for reorganization and for relief under chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Pursuant to said petition the said court appointed James B. Hart trustee.[1]

What may be said to be the sole asset of the corporation is a lease and option to purchase valuable mining property situate in Mariposa County, State of California. The cause is before us on an appeal from an order of the District Court extending said lease for a ten-year term.[2]

The lease involved was executed on December 16, 1933, and provided that lessees should operate the mine and pay a 10% royalty to the owners "of all production of and from said mine, from the gross returns of ores shipped and sold, the returns from all recovery of ores milled, concentrates, amalgams, mint returns on bullion [sic]." Time was to be of the essence, and it was also provided that any failure by the lessors to insist on strict compliance of the lease should not be deemed a waiver by the lessor of the right to insist on such strict compliance. Provision was made for an extension of the lease in the following clause:

"In consideration of, and the faithful compliance thereto by said lessees of the foregoing agreement and covenants therein, the said owner agrees that upon written application of the lessees to grant unto said lessees a further lease upon said mine, its improvements and acquisitions, an extension of this lease for a further term of ten years under the same covenants, royalties and rights."

The lease granted lessees an option to purchase by providing:

"Said owner, for and by the considerations and agreements herein therefore grants unto the lessees an option to purchase an undivided three-fourths (¾) interest in said mine * * * for the sum of fifty thousand dollars ($50,000) at any time within the period of this lease and or any extensions of time thereof; provided this lease shall be in force and effect."

Lessee attempted to exercise this option by serving notice on May 25, 1937 that it elected to exercise the option by the application of royalty payments until such payments totalled $50,000. The matter was litigated in 1942 and the District Court held the attempted exercise of the option not to be in conformity with its terms and, hence, did not constitute an election to exercise said option.[3] On appeal this court affirmed that judgment.[4]

The original lessees assigned their interest to one Ilseng, who formed the Mt. Gaines Mining Co., a Nevada corporation, and assigned to it the lease in question here, in December 1934.

At the time the lease was executed, the ownership of lessors was in dispute and the original lessees never secured possession. Ilseng entered in 1934 and found the entire mine in a state of disrepair and unworkable. The shaft had caved in and was filled with water. The hoist machinery had been removed, the mill and other buildings were in a rotting condition. The general aspect of disrepair was one natural to a property, the main part of which had not been worked since 1911.

Lessee assumed control and by intelligent and minerlike operation developed and extracted during the 10-year period of the lease, ending December 15, 1943, ore having a gross value of nearly one and one-half million dollars, and from this extensive operation over a ten year period the lower court was able to find but $93.19 due lessors as unpaid royalties.

On November 24, 1943, appellee, as trustee in bankruptcy, filed a petition asking

---

[1] In its order approving the filing of that petition the Court ordered the debtor to continue in possession of the mine under the terms of the lease involved herein.

[2] Appellants are: (1) Owners as trustees of the legal title, and (2) owners of 22/36ths of the equitable title of the mine.

[3] In re Mount Gaines Mining Co., D.C. Nev., 46 F.Supp. 910.

[4] Hart v. California Pac. Title & Trust Co., 9 Cir., 136 F.2d 430.

the District Court to direct him to apply for an extension of the lease. On the granting of that petition, appellee, on December 3, 1943, applied to appellants for a further lease, "the said agreement of lease to. contain the option as now contained in the present lease, and to run for the full period of 10 years as provided for in the lease."

Appellants refused to renew and appellee then instituted this proceeding by filing in the District Court a petition praying for a decree that appellee and the Mt. Gaines Mining Company be adjudged in lawful possession and that the lease and option were extended to December 16, 1953.

The Court found that appellee was entitled to a judgment quieting his title to the extended term of the lease and that appellee's written application to appellants on December 3, 1943 had extended the lease "under the same covenants, royalties and rights, including the option to purchase * * * as provided in said lease * * *."

The Court also found there had been no default or failure of faithful compliance with the covenants in the lease; that. appellees owed appellants $93.19 as unpaid royalties, and that the attempt to exercise the option to buy a ¾ interest in 1937 was ineffective for any purpose and did not exhaust lessee's right to exercise this option later.

On appeal, appellants attack the judgment on three major grounds:

1. That appellee, as trustee in bankruptcy, did not assume the lease, and, hence, had no right to an extension of that lease;

2. That the attempted exercise of the option, and appellee's application for a "further lease" constituted counter-proposals and, hence, rejections of the option and renewal provisions of the lease; and

3. That the District Court erred in finding that appellee had performed all of the conditions precedent so as to entitle lessee to an additional ten year lease, and that the Court further erred in finding that only $93.19 was due appellants as unpaid royalties.

First: Appellant argues that Hart, as trustee, has never assumed the lease. While no writing is found which expressly so provides, the facts and circumstances clearly demonstrate that he did.

The District Court, on June 29, 1939, approved the filing by Mt. Gaines Mining Company, of its petition for reorganization under Chapter 10 of the Bankruptcy Act, and ordered the debtor to continue in possession of the mine under the terms of the lease involved herein.

On August 11, 1939 appellee James P. Hart was appointed trustee of Mt. Gaines, and all of the debtor's "property, money, assets and accounts" were ordered turned over to said Hart.

From August 11, 1939 to December 15, 1943, the end of the first ten year period of the lease, Hart was, by the District Court, found to be in "lawful possession as lessee under said lease of all of the property". of the mine during which time ores were extracted and milled having a gross value of $766,381.86. Hart, as trustee, paid to appellants royalties of $76,556.36.

Hart, as trustee, tendered reports to appellants covering these royalties, furnished copies of smelter returns for the same period, and sent monthly reports covering the operations of the mines to representatives of lessors, all in accordance and compliance with the terms of the lease.

Hart, as trustee, caused extensive underground development of the mine to be made and placed additional machinery and equipment on the property, which included a sorting plant, amalgam barrel, etc., all done with the full knowledge and consent of lessors.

In 1942 Hart, as trustee, litigated the question of whether the Mount Gaines Company had exercised its option, contained in the lease, to purchase a three-quarter interest in the mine. The District Court held that Hart was not entitled to the relief he asked because "such option has not as yet been complied with", and dismissed the action without prejudice, and on appeal, we affirmed.[5]

At no time was there any question raised as to Hart's qualifications to prosecute the

---

5 See notes 3 and 4.

action because he had not assumed the lease. On the contrary, in its temporary restraining order, prior to its decision in that matter, the District Court ordered that "the trustee in reorganization *continue* to *pay* 10% rent and royalties *heretofore paid by virtue of the lease* and option" involved herein.

In December 1943 the court also ordered the trustee to apply for an extension of the lease in the following terms:

"It is therefore ordered and adjudged that James P. Hart, the trustee of the above named debtors, Mount Gaines Mining Company and International Mining & Milling Company, immediately file his written application and make a demand for the extension of the agreement of lease with option to purchase now owned by the Mount Gaines Mining Company for the said Mount Gaines Mine, under the same terms and conditions, all as provided in the agreement of lease with option to purchase dated December 16th, 1933, and to take all steps necessary for securing such extension."

From the foregoing facts the conclusion seems inevitable, not only that Hart assumed the lease and acted under its terms, but that such assumption was recognized by the lessors and by the District Court. It would seem that lessors, by reason of their recognition of the operation of the mine by Hart, as trustee, and the acceptance of the benefits resulting from such operation are in no position to question his assumption of the lease.

A further argument made in support of appellants' contention is that because appellee as trustee in bankruptcy did not assume the lease within 60 days after the adjudication, the lease is, under § 70, sub. b of the Bankruptcy Act,[6] deemed to have been rejected by the trustee.

Appellant argues that § 70, sub. b is applicable to reorganization proceedings under Chapter X of the Bankruptcy Act since § 102 of Chapter X provides that the provisions of Chapters I to VII (of which §

70, sub. b is a part) are applicable to Chapter X proceedings "Insofar as they are not inconsistent or in conflict with the provisions of this chapter."

However, we think that § 116 of Chapter X [7] which gives the judge power to permit the rejection of executory contracts (in which term leases are included by definition)[8] is clearly in conflict with § 70 sub. b and, hence, the assumption provisions of § 70, sub. b cannot apply to Chapter X reorganizations.[9]

§ 116(1) does not require the judge to act within 60 days or any other period. Yet if § 70 sub. b were held to apply to Chapter X proceedings and the trustee, as here, took no affirmative action for 60 days, the trial court would be foreclosed from any action in a Chapter X proceeding. Such a result is obviously inconsistent with the provision in § 116(1) of Chapter X allowing the trial judge to permit the rejection of a lease.

Furthermore, § 216(4) of the Bankruptcy Act states that a plan of reorganization under Chapter X "may provide for the rejection" of any lease and, as the Securities and Exchange Commission points out,[10] reorganization plans are seldom formulated within 60 days after adjudication and the statutory requirements for notice and hearing on the qualification of the trustees and the plan normally exceed 60 days. Clearly, lack of affirmative action by the trustee within 60 days should not work an automatic rejection of the lease in Chapter X cases.

In the ordinary bankruptcy which § 70, sub. b covers, the purpose is to liquidate the estate and to distribute the assets to creditors as soon as possible. Since continued operation of a lease held by the ordinary bankrupt is not contemplated, the trustee is required to decide whether the lease has any value, and if so, to dispose of it quickly so that the assets realized may be added to the bankrupt's estate.

---

[6] 11 U.S.C.A. § 110, sub. b.

[7] 11 U.S.C.A. § 516(1).

[8] 11 U.S.C.A. § 506(7).

[9] In re Childs Co., D.C.S.D.N.Y., 64 F. Supp. 282, Consolidated Gas Electric Light & Power Co. of Baltimore v. United Railways, 4 Cir., 85 F.2d 799, certiorari denied 300 U.S. 663, 57 S.Ct. 493, 81 L.Ed. 871.

[10] In a brief submitted in this case in which they are a statutory party under § 208 of the Bankruptcy Act, 11 U.S.C.A. § 608.

But in reorganization proceedings the purpose is rehabilitation of the debtor and to preserve it as a going concern if possible; therefore, it is vital that favorable leases be held and unfavorable leases be rejected. But often it. cannot be decided by the trustee within 60 days after adjudication (particularly when the trustee is not appointed until some time after the adjudication) whether a lease is favorable or not from the standpoint of continued operation. Here the lease was the sole asset of the debtor and rejection of the lease would have ended any possibility of reorganization. Consequently, the debtor was ordered by the District Court to continue in possession under the lease until the plan of reorganization could be prepared, and when the lease was about to expire, the Court ordered the trustee to apply for a renewal in accordance with the terms of the lease.

The difference between this situation and the situation normal to the usual bankruptcy covered by § 70, sub. b, is decisive, and hence, we hold that the assumption, rejection, and automatic rejection provisions of § 70, sub. b are inconsistent with and inapplicable to Chapter X reorganization proceedings.

Finn v. Meighan, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624, cited by appellants, is limited, by a subsequent modification by the Supreme Court of its original opinion, to the forfeiture provisions of § 70, sub. b, not here involved (325 U.S. 300, 302, 840, 65 S.Ct. 1147).

Second: Appellant contends that appellee's ineffective attempt in 1937 to exercise the option, terminated that option immediately since appellee in effect rejected the option by submitting a counter-proposal, namely, appellee's attempt to exercise the option on terms different from those set forth in the lease.

 It is of course elementary that a qualified acceptance, or a new proposal rejects the original offer, but here appellee's attempt to exercise the option was not a new offer. It was merely appellee's interpretation of what the option required on his part.

Appellee interpreted the option as permitting the royalties paid to appellants to be applied to the first payment of $10,000 due on the purchase price when the option was accepted.

The District Court held, and we agreed, that the first $10,000 was due in cash on the exercise of the option. But appellee's interpretation was, at the least, a reasonable one, with nothing to show an absence of good faith, and the District Court in holding against appellee, merely dismissed his petition without prejudice.

Appellee was well within the time during which he could exercise the option, and although, as we finally held, appellee's interpretation was not correct and his attempted exercise of the option ineffective, it cannot be said that appellee was rejecting, by making a counter-offer, the option in the lease. In an area not free from doubt he complied, as he thought, with the original offer. The events proved him incorrect as to the method of compliance and we agree with the trial court that the "attempted exercise of the option was * * * ineffective for any purpose and in no wise constituted an exhaustion of the right of the lessee to exercise said option to purchase * * *".

It is contended that the extension provision in the lease was merely an offer to grant a further lease, importing the idea of the execution of a new instrument by the lessor; and that the trial court erred in finding that appellee had, by his written application, extended the lease for an additional term of ten years.

In support of this argument appellant urges that lessor's offer was a conditional offer, conditioned on (1) faithful compliance with the covenants of the lease, (2) time to be of the essence, and (3) a written application for an extension to be in compliance with the offer, and not to propose new conditions or terms. Further, it is urged that the extension provision means only that the lessor offered a further lease of ten years on the same terms as the original lease (without the renewal clause), and including the option to buy, provided that option was not previously exercised or rejected.

From this appellant then argues that the trial court "tortured a mere 'application' for a new lease into an act which automatically extended the lease", because specific performance of a lease could not be compelled. Since specific performance is not sought we do not pause to consider that phase of appellants' argument.[11]

It is clear from the terms of the lease itself that the lessor's offer of an extension of the lease was conditioned on faithful compliance with the covenants of the lease by lessee. But, given such faithful compliance (which the trial court found, and which we shall consider later) we think the trial court was correct in holding that appellee's application extended the lease for an additional term of ten years on the same terms as the original lease.

True, appellee's application to lessor did request a "further lease" with the option "now contained in the present lease". But this was merely asking that to which he was entitled (assuming faithful compliance), since the lease provided for a "further lease upon said mine * * *, and extension of this lease for a further term of ten years under the same covenants, royalties and rights".

Appellee's application for a further lease was merely phrased in the terms of the lease itself and the application was for a "further lease, * * * being an extension of the present lease". Hence, appellee's application was not a rejection by way of a counter-offer since appellee proposed no new terms but complied with the lease by making application for what the lease granted him, in the very language of the lease itself.

Further, both the lease and appellee's application refer to an "extension" of the lease on its same terms, and we cannot hold that the trial court erred in deciding that the mere application actually extended the lease since regardless of whether this provision is interpreted as a renewal or an extension clause (a distinction which the California courts draw)[12] the terms and conditions of the extended term concededly are to be the same as the original period.

"Therefore, whether it be treated as an option for a 'renewal,' as the trial court did, or as a 'mere extension of the old lease,' is wholly immaterial, for in either case the terms and conditions are to be exactly the same". Braun v. Leo G. MacLaughlin Co., 93 Cal.App. 116, 123, 269 P. 191, 194.

"Where the parties, however, have agreed in writing upon the essential terms of the lease, there is a binding lease even though a formal instrument is to be prepared and signed later". Gavina v. Smith, 25 Cal.2d 501, 504, 154 P.2d 681, 682.

Appellee having accepted the offer of a renewal or an extension by notifying appellants of his decision, the parties were bound without more for an additional term of ten years, assuming faithful compliance by appellee, which is appellants' third contention, and to the consideration of which we now turn.

Third: The breaches of agreements and covenants contained in the lease of which appellants specifically complain fall roughly into three categories:

A. Breaches in connection with the payment of royalties in accordance with the covenant:

"That lessees shall pay as a royalty to the owner ten per cent (10%) of all production of and from said mine, from the gross returns of ores shipped and sold, the returns from all recovery of ores milled, concentrates, amalgams, mint returns on bullion * * *. That all payments shall be made and accompanied by a duplicate copy of such returns, not later than the 25th day of following calendar month; and that upon said 25th day lessees shall make in writing a full report of all operations, developments and exposures of moment".

B. Breaches in connection with violations of California law in accordance with the covenant:

"That all operations of said lessees herein shall be in accordance with the laws and mine and milling regulations of the state of California".

---

[11] See Gavina v. Smith, 25 Cal.2d 501, 505, 154 P.2d 681.

[12] Braun v. Leo G. McLaughlin Co., 93 Cal.App. 116, 123, 269 P. 191; Robertson v. Drew, 34 Cal.App. 143, 144, 166 P. 838; Cf. Orr v. Doubleday, Page & Co., 223 N.Y. 334, 119 N.E. 552, 1 A.L. R. 338.

C. Breaches in connection with failure to keep complete records in accordance with the covenant:

"That lessees shall * * * keep complete records of operations, accounts, mining maps and production * *. *."

■ A. Failure to pay royalties: Under this heading appellants specifically refer to 32 breaches: 1. Of these, five relate to late or unpaid royalties due Holcomb or Kempley. Holcomb and Kempley have waived any unpaid royalty and are now actively assisting the trustee and desire to have the lease extended. These five breaches therefore would not seem ground for refusal to renew, since the only persons adversely affected thereby do not complain.

■ 2. Seven other alleged breaches relate to the unpaid royalties shown on appellee's Exhibit FF which is a summary of production figures and royalties accrued and paid since the beginning of lessee's operations. This exhibit shows $498.96 unpaid in the period from September 21, 1934 to October 8, 1937, referred to as the Ilseng Period. The exhibit also shows $1,358.70 unpaid royalties during the period October 8, 1937 to May 9, 1938, referred to as the Humphrey Period. Although seven breaches are assigned for these two items, all those seven breaches refer only to these two items, totalling $1,857.66.

As to the Ilseng Period, the amount is less than $500, which, when considered with the total of over $141,000 of royalties paid might well be classified as de minimis. As to the Humphrey Period, there was evidence to support appellee's contention that this underpayment was acquiesced in by the lessors. Further, the evidence shows that the underpayments for both these periods have since been made up.

■ 3. Four breaches relate to the disputed deduction of $5.00 per ton made by lessees prior to the bankruptcy proceedings on each ton of concentrates hauled from mine to smelter. The trial court found that this deduction (which amounted to something in the neighborhood of $600) was

done with knowledge and consent of the mine owners, and because of lessee's construction of the lease.

■ 4. Two breaches relate to payments made two days and one day late, respectively, and as such hardly require serious discussion as a basis for refusing to renew a lease on a mine improved by lessees from a virtually valueless property to one worth nearly $300,000.

■ 5. Three breaches relating to the failure of appellees to enclose the required "statement", presumably the "duplicate copy of such returns", and the "full report of all operations, etc.", called for in the lease, belong in the same category as 4, supra.

■ 6. One breach refers to the Gullic judgment. This is a disputed item involving only $296.18. Appellee contends he settled a judgment liability of the mine owners involving occupancy of houses on the mine property, for a lump sum, at a saving of $296.18, which they then deducted from royalty payments. While there is no specific finding by the trial court on this issue, the court's general finding that lessee did not deviate from faithful performance, and the finding as to the amount of unpaid royalties still due would indicate that the court adopted appellee's contentions and there is support in the record for such a holding.

■ 7. One breach relates to "other lapses" in payments occasioned by strikes and other causes, although the lease specifically provided its terms were subject to "fire, flood, strike and other acts of God."

■ 8. One breach was caused by appellee's withholding part of a royalty payment one month upon receipt of notice from one royalty owner that he held a third party claim against another owner. This would scarcely appear to be a sufficient ground for refusing to renew the lease.

9. Seven breaches, involving approximately $3400,[13] are explained by appellee on the ground that they involve underpayments or late payments prior to June 1937.

___

13 These items may partially duplicate the $498.96 of unpaid royalties discussed in 2. supra, since that figure is the total unpaid royalties due in October 1937, whereas the $3400 covered in this heading include late payments, some of which were paid before October 1937

■ Appellee bases his principal explanation of these breaches on the ground that lessee sent a statement to appellants as of May 30, 1937, showing underpayment of only $17.00 to that date. To this statement no objection was made. Appellee argues that this amounted to an account stated which settled the royalty payments up to that date. Again we have only the trial court's general finding that appellee faithfully complied with the terms of the lease, but we cannot say that the record on this point requires a reversal. Appellants argue that appellee had exclusive knowledge of the facts on which the statement was rendered and that appellants had no way of ascertaining the correctness of the statement. But appellants had, by the lease, full access to lessees' books and could have ordered a full audit if it did not find the information readily available.

■ 10. One breach, involving $10.51, was occasioned by an "oversight".

B. Violations of California Law: Appellants set forth some 21 violations of Mine Safety and Mechanical Power Transmission orders of the California Industrial Accident Commission. Appellee does not dispute these separate violations. He does contend, however, that the lease provision had no reference to regulations of the Accident Commission, but referred only to statutes and regulations of the Bureau of Mines.

■ Assuming this contention is not well taken, the record shows that the Commission allows a reasonable time for correction of any infraction of its numerous regulations, and it further shows that all matters testified to as violations were settled, and the case closed as far as the Accident Commission was concerned. All of these alleged violations appear to be relatively minor infractions and while it was necessary for the Commission to call the attention of lessees to certain violations more than once, it nevertheless is undisputed that appellee was not proceeded against, the mine was not closed and lessors were not injured by any of the violations of these safety orders. Furthermore, correction of all these violations to the satisfaction of the Commission fully bears out the trial court's finding of faithful compliance.

With reference to the alleged violations, by lessee, of California mining regulations, the record disclosed an exceptionally safe operation of the mine.

Insofar as can be discerned from the record during said ten year period not one fatality occurred. Lessee received a letter from the Industrial Indemnity Exchange, the company carrying the compensation insurance, a portion of which we quote:

"You have asked that we write you a letter setting forth the classifications and rates applicable to your operations at Hornitos, California, by policy year from 1939 up to the current policy year, which will reflect to a certain degree your past experience and the safe manner in which you have operated your mine.

"We are pleased to enclose a copy of our History Sheet showing the premium and losses as well as the dividends earned from 1939 to 1944. This sheet also shows the classifications and rates applicable by policy year as well as the experience modifications. In 1939 you started out at manual rates and your favorable loss record has now produced for you a 25 per cent below manual, which is indeed a fine achievement."

The record further contains testimony of a mining engineer praising lessee's safety record. This expert also testified that it is a very rare thing for a California State mining inspector to go through any mine and not have improvements to suggest; and further that although "quite often very strict demands" are made, time is always allowed for corrections.

Lessors had knowledge of the alleged infractions of the mining regulations prior to the request for a renewal of the lease. The Humphrey interests not only had notice of these alleged violations as early as March 5, 1937, but they notified lessees of these alleged breaches then, and again in 1938.

At the time application for the extension was made owners of but a 10/36th interest opposed any extension. All of the other beneficial owners, or lessors, either favored an extension of the lease for another 10-year period, expressed no opinion, or favored a new lease which would not con-

tain an option in lessee to purchase a three-quarters interest in the mine. Holders of 26/36ths interest were sufficiently satisfied with lessee's compliance with the mining regulations to trust them with the continued operation of the mine, if other terms of the lease were adjusted.

C. Failure to keep complete records: Appellants' contentions on this point are based on the testimony of one Thain, the accountant employed by appellee, to the effect that he was unable, in reviewing the books of the Company in the early days of the lease, to determine from those books just what the royalty liability was as to various lots of concentrates, ores, and bullion sent to the smelter at particular times. Thain testified that it was necessary for him to go outside the books covering that early period for oral and other information to make up his records, and that some of the hauling deductions were not fully reflected on the books.

The fact remains, however, that despite this difficulty that Thain experienced in examining the books kept by his predecessors, he was able to work out the royalty liability of the lessee over the whole period of the lease. It should also be noted that the only complaint as to the failure to keep these records appears in this suit. Appellants can scarcely claim injury now because appellee's accountant had trouble, due to the method, or lack of method of bookkeeping used in the early days of the lease, in determining lessee's liability. There is no complaint by appellants that, at any time during the period when the completeness of the records is challenged, appellants were unable to determine how much it was owed, or how it was harmed by this alleged violation of the lease.

These then are the breaches and violations of the covenants relied upon by appellants as justifying their refusal to renew the lease. Appellants urge that strict compliance with all covenants in the lease was a condition precedent to the granting of a new lease, and argue that, while the breaches here perhaps would not justify a forfeiture, they are sufficient to warrant appellants' refusal to renew appellee's lease. In support of this proposition appellants cite Swift v. Occidental Mining & Petro-

leum Co., 141 Cal. 161, 74 P. 700, and Behrman v. Barto, 54 Cal. 131.

In Swift v. Occidental Mining & Petroleum Co., supra [141 Cal. 161, 74 P. 704], the language relied on that "The waiver of the forfeiture is one thing; the renewal of the lease is quite another", etc., was unnecessary to the decision in that case, which was to remand the proceeding for a new trial because findings, other than those to which the quoted language was applicable, were held to be unsupported by the evidence. (141 Cal. 171, 74 P. 700) Furthermore, the court did, also by way of dictum indicate that a practical construction of the lease by lessee, or a waiver of a doubtful right in the lease by lessor should certainly not defeat the right to a renewal.

Behrman v. Barto, supra, merely holds that where the lessee had committed certain defaults, her remaining in possession after the original term would not constitute notice to the lessor that lessee elected to continue the lease.

The trial court found no deviation from faithful performance of the lease because of any grossly negligent, wilful, or fraudulent breach of duty, and, viewing the whole record, we are unable to disagree with the trial court.

Under the terms of the lease faithful performance is the requirement. It is not reasonable in human experience to expect that there could have been full, exact, strict, complete and perfect compliance with all of the covenants. Operators of a mine are dependent on all their employees doing their full duty at all times. Despite the exercise of the highest standard of care some breaches were bound to occur over a 10-year period. At some point during the term some of the records were bound to be "incomplete" within that covenant of the lease. At certain times, due to the impossibility of human perfection, some of the Mine Safety Orders were bound to be violated.

But a readiness on the part of lessees to comply when violations were called to their attention is evidenced by the fact that before the Industrial Accident Commission was required to take steps which

might have slowed production or otherwise injured lessor, all violations were corrected.

It is significant that none of the violations alleged under any category materially harmed the productivity of the mine. For it must be kept in mind that lessees took a virtually worthless, wholly inoperative mine at the beginning of their term, and within ten years they had produced nearly one and one-half million dollars worth of ore, paid lessors over $141,000 in royalties, placed nearly $60,000 worth of equipment at the mine, and developed ore in place at the end of their term on which an estimated net profit of some $200,000 may be made.

Viewed against this background and against the background of the due diligence exercised by appellee in his faithful performance of the lease, we think he has sufficiently complied with the condition precedent.

Our conclusion in this regard is strengthened by § 3275 of the Civil Code of California: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or *a loss in the nature of a forfeiture,* by reason of his failure to comply with its provisions, he may be relieved therefrom, *upon making full compensation* to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." (Italics ours.)

§ 3275 is but an affirmance of the generally prevailing equitable principles, and for an excellant discussion of those principles, see Fountain Co. v. Stein, 97 Conn. 619, 118 A. 47, 27 A.L.R. 976.

It can scarcely be questioned that the refusal to renew so valuable a lease would, if sustained, be a "loss in the nature of a forfeiture". The lower court has found, and we think correctly, that there was no "grossly negligent, willful, or fraudulent breach of duty". Therefore, the only question remaining is whether lessee has made "full compensation to the other party".

As we have said, the breaches alleged fall into three classes. As to the underpayment of royalties, the trial court found that $93.19 was the amount required to give lessors "full compensation", and the judgment orders appellee to pay that sum. As to violations of the state laws and regulations, the record shows that all violations have been corrected and that lessee is now in full compliance.

As to failure to keep records, appellee has now compiled a full summary of its production, deductions made, and royalties paid during the 10-year term. We do not understand that appellants, aside from challenging the right of appellee to make certain of the deductions shown, question the correctness of the figures shown on this summary.

Thus, full compensation has been made to the lessor, in the sense that all of the deficiencies have been made up, and what lessor complains of as missing has been supplied. Consequently, we do not think the case is like that of Crowell v. City of Riverside, 26 Cal.App.2d 566, 80 P.2d 120, where the court held that § 3275 would not apply to relieve against a violation of a covenant not to sublet. Such a covenant is clearly not subject to "full compensation" for its breach.

Judgment affirmed.

DENMAN, Circuit Judge (dissenting).

I dissent, inter alia, because this court has rendered a decision on important questions of California law in conflict with the California decisions of Crowell v. City of Riverside, 26 Cal.App.2d 566, 581, 80 P.2d 120, and Leslie v. Federal Finance Co., 14 Cal.2d 73, 78, 80, 92 P.2d 906, and instead has based its decision upon these questions on the law as stated by the Supreme Court of Connecticut.

I do not agree that a mine owner has not the power to make an option for a renewal of a lease of his mine conditioned on the protection of the miners who risk their bodies and lives to extract the gold from which his lease royalties are paid.

In the instant case are forty-three (not twenty-one, as stated in the court's opinion) admitted violations of the "mine * * * regulations of the State of California," later considered in detail as to their importance in the California law. As shown, they all related not to the profit of the lessor but concerned the safety of

the miners by whose work below ground the hoped for profit of both lessor and lessee was to be created.

The renewal of the ten year lease and option was made dependent on the performance of the following covenant not to commit such violations: "That all operations of said lessees herein shall be in accordance with the laws and mine and milling regulations of the State of California." The court, in effect, holds that the option of the renewal of a mining lease cannot be conditioned on the performance of such a covenant because that would create something in the nature of a forfeiture.

There is no evidence that the violations of the regulations caused or could have caused any injury to the lessor corporation or its successor in interest the Title Insurance and Guaranty Co., for which they could be given the "full compensation" referred to in the last paragraph of the court's opinion rejecting the applicability of Crowell v. City of Riverside, supra. Indeed, the lessor mine owner is protected by the rule stated in Smith v. Belshaw, 89 Cal. 427, 430, 26 P. 834, that the lessor is not liable for injury to miners by negligence of the lessee while he is in complete possession and control of the mine under the lease. Further, here were covenants of the lease "to post and keep posted legal non-liability notices for said owner" and that "the lessee will carry legal compensation insurance on all men by them employed."

This was the factual situation in Crowell v. City of Riverside. There the renewal of the lease was conditioned upon the performance of a covenant not to sublease. This covenant was broken. There, as here, the lessee claimed the denial of the lease renewal would be in the nature of a forfeiture and that he was within the provisions of Section 3275 of the Civil Code of California that "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a

grossly negligent, *willful,* or fraudulent breach of duty." (*Emphasis* supplied.)

The Crowell case holds that because the breach of the covenant not to sublease was not compensable in money damages, section 3275 is not applicable. The area not covered by that section is held, at page 581, of 26 Cal.App.2d, at page 127 of 80 P.2d, to be

" 'Relief is generally confined to cases of covenant for the payment of money where the amount can be unquestionably fixed, and not to covenants to keep insured, and the like.'

"Also that:

" 'Forfeiture for breach of covenant not intended merely as security for the payment of money will not generally be relieved against, for the reason that no exact compensation can be made.'

"Also that:

" 'Among these covenants for a breach of which no relief can ordinarily be given is that to repair generally, or to make specific repairs, or to lay out a certain sum of money in repairs or erections within a specified time; the covenant to insure; the covenant not to assign without license; and in other covenants of a special nature.'

" * * * The breach in the instant case of the inhibition against subletting, which, as we have held, amounted to a condition by which appellant Warren was bound, was not one susceptible of being compensated in money."

So in the instant case the breaches of the agreement to comply with the safety laws and regulations could not be compensated for by the payment of money damages to the lessor. As later stated in detail, the damages, if any, from the violation of the California mining safety regulations are to the innocent third parties whose eyes are blinded or backs are broken or whose husbands and fathers are killed from their violations. Obviously the damages to these persons whom the lessor has sought to protect cannot in any way be made good by a money payment to the lessor.

From this it is clear that if a mine lessor makes his lease renewable only, say, if no Cornish miners are employed, the denial of a renewal because such mining crews

were employed is not in the nature of a forfeiture, even if it were shown that such miners were more efficient and produced larger royalties to the lessor. A lessor may make what conditions he pleases for the renewal of a lease. Here the lessor chose the performance of the California mining safety regulations.

Also in the Crowell case, at page 581, of 26 Cal.App.2d, at page 127 of 80 P.2d, the word "willful" in Section 3275 is held "to be understood in its ordinary sense of 'spontaneous' or 'voluntary'." In that sense many of the violations of the California safety regulations hereinafter considered are directly attributable to the lessees mining superintendent's willful disobedience.

The court's opinion is also contrary to the law of California as stated by its supreme court in Leslie v. Federal Finance Co., 14 Cal.2d 73, 80, 92 P.2d 906, 910. There it was claimed that the agreement was a mere contract for an option, to which relief from forfeiture under Section 3275 did not apply. The supreme court held that there was no option but a contract of redemption to which that section applies. It states the contention and the law as to the option agreement as follows:

"In the present case the finance company insists that the consent decree is nothing more than an option to purchase which was not exercised by the appellant within the time limited and that it terminated upon the expiration of that time.

"It is true that time is of the essence of the ordinary option contract and no forfeiture results from a strict enforcement of its terms, *because an option is merely an offer to sell and vests no estate in the property to be sold.* Wightman v. Hall, 62 Cal.App. 632, 217 P. 580; Williston on Contracts, vol. 3, Rev.Ed. p. 2389, § 853. \* \* \*". (Emphasis supplied.)

Here the option vests no estate in the mining property. An option is not the kind of contract for which the relief under Section 3275 applies to breaches of conditions not compensable in money, any more than when the time for its exercise has expired. This later California decision is in accord with the supreme court's earlier statement in Swift v. Occidental Mining & Petroelum Co., 141 Cal. 161, 173, 74 P. 700, 704, that

" \* \* \* The neglect of the landlord to strictly enforce his right of forfeiture for breach of condition does not entitle the tenant to a renewal when such renewal is dependent upon faithful performance of conditions. There is no finding, and no evidence to warrant a finding, that plaintiffs consented to any cessation of the work of exploration and development, and their *mere failure to enforce a forfeiture for the cessations which occurred in 1894-95 and 1898-99 was not a waiver of performance of the conditions upon which they had bound themselves to renew the lease.* \* \* \*

"It was error to allow the stockholders and directors of the company to testify that they expected and counted upon a renewal of the lease. The only way they could entitle themselves to a renewal was by performing the conditions of their lease. Without this their expectations were of no avail, and with it unnecessary. \* \* \* (Emphasis supplied.)

The importance of the mining safety regulations is shown by the history of hte legislation creating them. The gold mining states, like California, through years of social and political struggle since the days of the slaughter of miners in the Comstock Lode and other dead Nevada mines, have enacted a system of laws and regulations for the protection of the human beings working below ground. In California this protection is both by punitive statutes and by regulations built up through the years by the California Industrial Accident Commission.

Forty-three of these protections are admitted to have been violated by the lessee. Twenty-one are detailed in the footnote.[1]

---

1) On April 28–29, 1936, the mine was being operated without guard rails or chains to protect the opening at the collar of the main working shaft as provided by Mine Safety Order No. 1732 then in force which reads as follows:

"Order 1732. Shaft Protection

"(a) At the top of all shafts and at all shaft stations, a gate, guard rail, or other protection subject to the approval of the Industrial Accident Commission shall be installed and kept in place ex-

All these violations are of regulations vital to the protection of men lowered down and hoisted up in cages in elevators in shafts taking them to and from the lower levels

cept when the cage, skip bucket or other conveyance is being loaded or unloaded thereat."

2) On April 28-29, 1936, the mine was being operated without an underground telephone system in violation of Mine Safety Order No. 1755 and

"An act providing for the establishment and maintenance of a telephone system in mines and prescribing a penalty for the violation thereof.

[Approved June 13, 1913. In effect August 10, 1913.]

"The people of the State of California do enact as follows:

"Section 1. In all mines operated and worked in this state where a depth of more than five hundred feet underground has been reached, a telephone system must be established, equipped and maintained by the owners or lessees thereof with stations at each working level below the depth aforesaid, communicating with a station thereof on the surface of any such mine.

"Sec. 2. The failure or refusal of any owner or lessee to install or maintain such telephone system shall be deemed guilty of misdemeanor and punished accordingly [St.1913, p. 782.]"

3) On April 28-29, 1936, the mine was being operated without a two rail railing on the dump track runway from the mine to the mill which for approximately 200 feet was over four (4) feet from the floor (ground) level and in places from eight (8) to ten (10) feet from the floor (ground) level in violation of General Safety Order of the California Accident Commission No. 13 which reads as follows:

"(a) All elevated walks, runways or platforms, except on unloading sides of platforms, if four (4) feet or more from the floor level, must be provided with a two-rail railing not less than three and one-half (3½) feet high. * * *"

4) On April 29, 1936, the mine was being operated with an inflammable change house within one hundred feet of the main mine shaft in violation of Mine Safety Order No. 1741 (g) which reads as follows:

"(g) Timber framing or storage sheds or any inflammable structure * * * shall not be placed or permitted to remain within one hundred feet of any mine opening, shaft house or hoisting engine house. * * *"

5) On January 26, 1937, the mine was being operated without a safety guard over the gears of the lathe in its shop in violation of Mechanical Power Transmission Safety Order No. 2627 of the California Industrial Accident Commission then in force.

6) On January 26, 1937, the mine was being operated without a safety guard to prevent personal contact with the spokes of the hoist gear in violation of Mechanical Power Transmission Safety Order No. 2627.

7) On January 26, 1937, the mine was being operated without a second rail on the guard rail at the edge of the cam floor in violation of said General Safety Order No. 13.

8) On January 26, 1937, the mine was being operated without a screen on the guard rail which guarded the bull wheel in violation of said Mechanical Power Transmission Safety Order No. 2607 (2627).

9) On October 6, 1939, the mine's hoisting engineer did not have a physician's certificate as was required by Mine Safety Order 1743 which reads as follows:

"Order 1743. Hoisting Engineers.

"(a) At every mine where men are hoisted or lowered there shall be one or more men to be known as hoisting engineers. These men shall be able to speak and read English readily, and must have had practical experience in operating mine hoists. Each hoisting engineer shall be given a thorough physical examination at least once a year, by a medical physician authorized to practice in California. The physician shall complete the examination form and send it to the employer after signing, detaching and delivering the lower part to the applicant for posting in the hoist house. * * *

"No man shall act as a hoisting engineer until he has successfully passed the prescribed physical examination for a hoisting engineer."

10) On October 6, 1939, a notice stating rate of burning of fuse was not posted at collar of shaft as provided in Mine Safety Order 1763-b, which reads as follows:

"Order 1763. Fuse. Blasting.

"(a) * * *

"(b) Notice shall be posted at the entrance of every mine stating the rate of burning of the fuse used."

11) On October 6, 1939, the hoisting cable in the mine which had a diameter of less than ¾ inch was fastened to the G-3 raise skip by only three clips instead of four as required by Mine Safety Order 1739, which reads as follows:

"Order 1739. Hoisting Ropes (Steel or Iron).

"(i) Every rope used for hoisting or lowering men shall be securely fastened at both ends * * *

where they work, often in poisonous gases and in constant danger of crushing from cave-in of the tunnel walls or from negligent handling of their explosives and their fuses.

What this court holds is that an owner of a mine cannot make a ground of the forfeiture of a lease of his mine or a condition precedent to its renewal, the violation of these laws and regulations for the protection of the miners because (a) the owners, the *lessors,* "were not injured by any of the violations of these safety orders," and (b) "before the Industrial Accident Commission was required to take steps which might have *slowed production* or otherwise *injured lessor,* all violations were corrected." (Emphasis supplied.) The question is not whether there is a "slowed production or [an] otherwise injured lessor."

I dissent from such an inhuman limitation on the power of the owner of a mine to protect the producers of his royalties, the employees of his lessee, from dangers necessarily inherent in their production. Of course, it is not the mine owner whose legs are crushed or eyes blown out from the violations of the regulations regarding the rate of burning of fuses and of the storage of powder, as shown in items 10 and 17 of footnote 1. Nor is it the owner's wife who is widowed because of any one of the four violations (items 2, 13, 19 and 21) of another regulation there is no telephone from the lower levels to advise that the opening of a gas pocket has asphyxiated her husband and that he must have immediate medical attention. Nor are the owner's children fatherless if through the violation of the regulation respecting the wire hoisting rope (items 11 and 14) a cage is dropped and twenty miners are killed, or are otherwise killed because of the eight failures to provide guard rails at

---

"(R) (d) For all wire ropes less than ¾ inch in diameter, at least four clips shall be used."

12) On October 6, 1939, the surface powder magazine used in the operation of the mine did not have posted on each side of it any sign as provided by Mine Safety Order 1747, which reads as follows:

"Order 1747. **Surface Storage Magazines.**

"(a) * * *

"(b) (1) * * * Upon each side of such magazine there shall be at all times kept conspicuously posted a sign with the words 'Magazine,' 'Explosives,' 'Dangerous,' legibly printed thereon in letters not less than six inches high."

13) On October 6, 1939, the mine was being operated without any telephone installed on the 700 foot level in violation of said Mine Safety Order No. 1769.

14) On October 16, 1938, the mine was being operated with the set screws in collar of cam shafts unguarded in violation of Mechanical Power Transmission Safety Order 2630 which requires that exposed set screws be guarded.

15) On October 6, 1939, the mine was being operated in violation of Mechanical Power Transmission Safety Order 2614 in that the dead end of the stamp drive countershaft in its stamp mill was not covered with a rotating caseing as was required by said Order 2614.

16) On October 6, 1939, the mine was being operated in violation of Mechanical Power Transmission Safety Order No. 2612 in that no guard rail was installed along the length of the countershaft of the mill 15 to 20 inches from the shaft, as required by said Order.

17) On March 22, 1940, the mine was being operated without any provision made at the 100-10 hearing for temporary storage of powder, as required by Mine Safety Order 1748.

18) On March 22, 1940, the mine was being operated in violation of said Mine Safety Order 1743 in that a doctor's certificate of the hoisting engineer was not posted on the wall of the hoist house, as required by said Order 1743.

19) On March 22, 1940, the mine was being operated in violation of Mine Safety Order 1771, in that there was not installed therein an emergency telephone line from the lowest working level of the hoisting shaft to the surface through the second or emergency exit of the mine, as required by said mine Safety Order 1771.

20) On March 22, 1940, the mine was being operated in violation of Mechanical Power Transmission Safety Order 2608 in that the flywheel on the ore crusher was not enclosed, as required by said Order.

21) On March 20, 1941, the mine was being operated in violation of Mine Safety Order 1771 in that the emergency telephone line from the 700 foot working level which had been run to the surface through the second exit had not yet been connected to the surface telephone as required by said order.

dangerous places as shown in items 1, 3, 5, 6, 7, 8, 16 and 20.

I dissent from the court's holding that such violations are "relatively minor infractions" when the Chief of the Bureau of Industrial Accident Commission finds

"* * * These unsafe conditions of your place of employment constitute a menace to the lives and safety of any person or persons employed thereabout and such places of employment, machines, devices, or apparatus, are being operated or used in violation of the laws of the State of California, and the Safety Rules and Orders of the Industrial Accident Commission of the State of California,"

and the Commission itself orders

"It is further ordered that the use and operation of said equipment be, and it is hereby prohibited, until said conditions shall be rectified, as aforesaid;

"And the Legal Department and/or any employee of the Commission are hereby authorized to attach notice of said prohibition to said equipment and to institute any civil or criminal proceedings in the courts which may be necessary to adequately enforce this order."

If these regulations to protect life and limb are held "minor," one well may wonder what of the Industrial Accident Commission's regulation are "major" protections.

I further dissent from the court's holding that it is a "faithful performance" of the covenant to comply with the safety laws and regulations to violate them and later, under the pressure of threatened prosecution of the Accident Commission, such as above quoted, to cease violating them. Particularly since the cessation of violation makes possible the admitted extraction of nearly $1,500,000 in gold during the ten year period of the lease.

The lessee was a corporation and necessarily the violations were through its agents. It was proved and not denied that a copy of the violated regulations were served by the Commission on the lessee before any of the violations occurred. It certainly is not a faithful compliance of the superintendent of the mine not to have read them.

This is not a case of casual violations of minor subordinates. It is the superintendent's continued obligation to have a telephone system installed in the several levels below a vertical distance of 500 feet from the surface. Yet this regulation was violated four times and only ceased on four pressures from the Commission. It is strange doctrine for this circuit to call it a faithful compliance with the laws and regulations, first to violate them and thereafter comply with the enforcing orders by ceasing the violations. It is not a strained analogy to say it is like putting the cart before the horse.

Nor was there prompt cessation of the violations. On February 5, 1942, upwards of twenty other violations of the regulations in addition to the twenty-one in footnote 1 were called to the attention of the lessee by the Commission's representatives. On March 2, 1942, the representative inspected to find what had been done, discovered then, over three weeks later, that seventeen had not been complied with and was told "the only reason for not complying was they hadn't got around to it yet." These latter violations ceased only when threatened with the institution of "civil or criminal proceedings in the courts."

At no time was there acquiescence by the lessor in such violations. On the contrary, as the court's opinion shows, the earlier violations of 1935 were twice protested. As to the later years there is no evidence of their waiver as a condition precedent to the extension of the lease.

Since there was a breach of the conditions precedent to the lease renewal, it is nowise a waiver of the breach that a majority of the stockholders in the mine owner's corporation were ready to make a *different and more favorable* lease. The argument of the court in that regard defeats itself. These stockholders were ready to make a new lease, not to make effective the option for a continued lease of the original agreement.

Nor is there merit in the court's contention that because the insurer advised that the company had had a good death and accident record in comparison with other companies, the violation of the condition precedent was waived. The option provi-

sion required obedience to the safety regulations. It did not provide that one may make forty-one violations, many of essential safety importance, "provided your violations produce less death and injury than other mining operators." So to hold is to rewrite the contract.

Nor am I able to agree with this court's contention that the fact that in ten years the lessee was able to take $1,500,000 from a mine that theretofore had been unsuccessfully worked has anything to do with the right to the renewal of the lease at the end of the ten-year period. For all that appears, the ten years' effort of the lessee was amply rewarded. It is nonetheless a breach of conditions precedent that the lessee, if they had not been breached, would continue for five years longer to make further profits. The lease did not provide that the lessor would rely upon these non-performances only in the event the mine was not worth a further leasing. If the lack of success of the prior operations were a factor in determining the legal effect of the option to the successful operator, then it well could be argued that only because of the lifting of the value of gold by its demonitization by Congress in 1933 was the second operation thereafter successful.

The judgment of the district court should be reversed.