In the Matter of **QUEENS BOULEVARD WINE & LIQUOR CORP.**, d/b/a Gold Star Wine & Liquor, Debtor-Appellee,

v.

**Anita BLUM et al., Petitioner-Landlord-Appellants.**

**No. 179, Docket 73–1512.**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1973.

Decided June 11, 1974.

Hays, Circuit Judge, filed dissenting opinion.

Robert M. Rosen, Garden City, N.Y. (Goldson, Rosen & Goldson, Garden City, N.Y., on the brief), for debtor-appellee.

Jerome I. Lessne, New York City, (Leonard Holland, and Dreyer & Traub, New York City, on the brief), for appellants.

Before MOORE, HAYS and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from an order entered in a Chapter XI proceeding in the Eastern District of New York, Orrin G. Judd, *District Judge,* denying a landlord's petitions and granting a debtor's petition for review of an order of a referee in bankruptcy, the sole question is whether, under the circumstances of this case, a bankruptcy court is required, pursuant to Sections 70(b) and 302 of the Bankruptcy Act, 11 U.S.C. §§ 110(b) and 702 (1970), to enforce a conditional limitation in a commercial lease which authorized the landlord to terminate the lease in the event its tenant should file a petition for an arrangement under Chapter XI of the Act. The district court held that the bankruptcy court was not so required. We affirm.

I.

The facts are not in dispute and may be briefly summarized.

The debtor-appellee, Queens Boulevard Wine & Liquor Corp. (Queens), owns and operates a retail liquor store in Forest Hills, New York. On April 28, 1970, it entered into a seven year lease with appellant, Carol Management Company (Carol), for the premises at 103–05 Queens Boulevard. The lease was on the New York Real Estate Board's standard form for stores. It included, as Article 16(b), a bankruptcy clause.[1] This clause was amended by a typewritten addendum, Article 63.[2] The bankruptcy clause, as amended, permitted the land-

lord to terminate the lease within a reasonable period after institution of bankruptcy proceedings by or against its tenant upon the condition that there be no forfeiture if obligations under the lease should remain unaffected by the bankruptcy proceedings and if the tenant should continue to comply with the terms of the lease, including prompt payment of rent. The lease further provided that the landlord, at its option, could apply any or all of its tenant's $8000 security against rent due.

By March 22, 1972, Queens had failed to pay the rent due on March 1. Carol instituted a summary proceeding in the Queens County Civil Court seeking a judgment of eviction and rent arrears. On the same day, Queens filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1970). It listed debts of approximately $370,000 and assets of approximately $73,500.

Upon Queens' application, the referee on March 27 entered an order continuing it temporarily in possession and, pending a final decree, staying the commencement and continuation of suits to enforce liens against it. This included Carol's state court summary proceeding.

Thereafter, pursuant to Carol's demands and the referee's order, Queens offered on April 4 to pay all rent then due subject to obtaining a surety bond which its creditors required in order to stay its adjudication as a bankrupt. The landlord found this to be satisfactory.[3]

---

1. Article 16(b) of the lease provides:
"If at the date fixed as the commencement of the term of this lease or if at any time during the term hereby demised . . . Tenant make an assignment for the benefit of creditors or petition for or enter into an arrangement this lease, at the option of Landlord, exercised within a reasonable time after notice of the happening of any one or more of such events, may be cancelled and terminated . . . . "

2. Article 63 of the lease provides:
"Notwithstanding the provisions of Article '16' hereof, in the event no relief is requested in any of the bankruptcy proceed-

ings set forth in Article '16' hereof to disaffirm this lease, or to reform the same, . . . and provided, further, that all rent, additional rent and other charges due from Tenant under this lease are paid promptly when due, . . . this lease shall not be terminated as provided in Article '16' hereof, but shall continue in full force and effect."

3. When Queens found itself unable immediately to obtain the surety bond, the referee adjudicated it to be a bankrupt. On April 11, however, the referee modified this order and granted Queens leave to continue in possession subject to its posting the indemnity bond.

While arrangements for obtaining the bond were underway, however, Carol received an offer to lease the store at a higher rent. By a letter dated April 21, it therefore served on Queens a notice of termination of the lease.

On May 11, having obtained the required bond, Queens tendered to Carol a certified check for the full amount of the rent then due for the months of March, April and May. Carol rejected this tender. It pressed its application to have the March 27 stay vacated and to regain immediate possession of the premises.

■ In an opinion filed on June 20, the referee held, among other things, that Carol had not waived its option under Article 16(b) by its demands for rent and by its April 21 letter it had effectively terminated the lease. The referee nevertheless ordered that Queens continue in possession and directed it to pay a sum equal to the rent as compensation for use and occupancy.[4]

The parties filed cross petitions for review of this order. Carol sought immediate possession. Queens sought a declaration that the termination clause was invalid. While these petitions were pending, Queens' creditors tentatively accepted a plan of arrangement. The plan contemplates that Queens will remain in possession of the leased premises throughout the term of the lease. Confirmation of the plan has been adjourned pending determination of the instant petitions for review.

As a result of an infusion of outside capital, Queens presently is operating at a profit of approximately $2000 per week. It has continued prompt payments to Carol for use and occupancy of the store. In addition, pursuant to an order of the referee, it has paid to the trustee $1000 per week (such payments having totalled more than $50,000 to date) to be applied toward payment of its debts if the plan of arrangement is accepted and confirmed.

## II.

Section 70(b) of the Bankruptcy Act, 11 U.S.C. § 110(b) (1970), made applicable here by Section 302 of the Act, 11 U.S.C. § 702 (1970),[5] provides in pertinent part that:

"an express covenant that . . . the bankruptcy of a specified party . . . shall terminate the lease or give the other party an election to terminate the same shall be enforceable."

Carol contends that the statute requires us to reverse the district court and to award it immediate possession of the premises. Queens, on the other hand, maintains that Carol's conduct prior to its April 21 notice of termination was inconsistent with its subsequent attempt to invoke Article 16(b) and that Carol therefore is estopped from terminating the lease. In the alternative, Queens argues that a bankruptcy court, in the exercise of its inherent equitable powers, may refuse to enforce a valid termination clause if the circumstances warrant.

Courts traditionally have not favored lease forfeitures. They often have strained to construe forfeiture clauses narrowly or to find them not an "express" convenant within the requirement of the statute. See generally 4A Collier, Bankruptcy ¶70.44[3], at 544–46 (14th ed. 1971). Even when such a lease covenant has been found to be valid on its face, courts have created two exceptions to mitigate the harsh consequences of what otherwise would be the absolute mandate of Section 70(b). First, some courts have held that a landlord, by conduct evidencing an intent to affirm the lease, may waive the right to terminate or be estopped from asserting it.

4. Carol's continued acceptance of payments for "use and occupancy" does not constitute acceptance of "rent". Matter of Wil-Low Cafeterias, Inc., 95 F.2d 306, 309 (2 Cir.), cert. denied, 304 U.S. 567 (1938).

5. Geraghty v. Kiamie Fifth Avenue Corp., 210 F.2d 95 (2 Cir. 1954) (Ch. XI); Finn v. Meighan, 325 U.S. 300, 302–03 (1945) (Ch. X).

Speare v. Consolidated Assets Corp., 360 F.2d 882, 887 (2 Cir. 1966); Davidson v. Shivitz, 354 F.2d 946, 948 (2 Cir. 1966); Matter of Frazin & Oppenheim, 183 Fed. 28 (2 Cir. 1910). Secondly, at least two courts have held and others have suggested that they are empowered to refuse enforcement of similar lease provisions on the ground that termination would work a substantial injustice to the lessee and would serve only to frustrate the basic reorganization purpose of Chapter X. Weaver v. Hutson, 459 F.2d 741 (4 Cir.), cert. denied, 409 U.S. 957 (1972); In re Fleetwood Motel Corp., 335 F.2d 857 (3 Cir. 1964).[6] Cf. In re Yale Express System, Inc., 362 F.2d 111, 117 (2 Cir. 1966); In re Penn Central Transportation Co., 347 F.Supp. 1351, 1353 (E.D.Pa.1972).

■■ In the instant case, the referee found, and the district court accepted the finding, that there was no waiver. We may not upset such a finding unless it is clearly erroneous. In re Simon v. Agar, 299 F.2d 853 (2 Cir. 1962). True, the most common indices of waiver are absent here. At no time prior to invoking its right to terminate did Carol accept payment of rent. B.J. M. Realty Corp. v. Ruggieri, 338 F.2d 653, 654 (2 Cir. 1964). Nor did it delay unreasonably in giving notice of termination. Geraghty v. Kiamie Fifth Avenue Corp., *supra*, 210 F.2d at 98. Carol's conduct prior to April 21 nevertheless strongly suggests that it was willing to accept payment of rent arrears, to forgive Queens' default and to continue under the lease.

Carol's immediate response to the order staying the state summary proceeding was a letter to Queens dated March 31 indicating complete awareness of its right to terminate but refraining from doing so. Thereafter, on April 4, a

hearing was held on Queens' application to continue in possession. Carol again made specific reference to its Article 16(b) right but stated its position as follows:

"We, of course, are looking for our rent for the months of March and April, and also we want to have our rent secured for any other months in the lease.

\* \* \*

It is our request now that the stay [of the state eviction proceedings] be lifted, or else that the money be paid."

Pursuant to these demands and in view of Queens' willingness to comply, the referee ordered immediate payment of the rent. Carol agreed to accept payment. Because of its inability to secure the required surety bond, however, Queens temporarily was adjudicated a bankrupt and thus was unable to comply with the order. On April 7, in response to Queens' application for a stay of the bankruptcy adjudication, Carol once again demanded that the rent be paid or that the stay of eviction proceedings be vacated.[7]

These demands strongly indicate that Carol initially was concerned primarily with being paid and that it intended to accept tender of the rent. Relying on this, Queens, its creditors and their attorneys worked assiduously to obtain the necessary indemnity and to formulate a satisfactory plan of arrangement. It was not until these negotiations were well underway that Carol, on April 21, sent its notice of termination; and it did so then only because it had found a new tenant willing to pay a higher rent. Moreover, Carol was entitled throughout to set off against Queens' sizeable security deposit its claims for rent that was due, but did not do so despite its agree-

6. Since Chapters X and XI both contemplate the continued viability of the debtor, the fact that *Weaver* and *Fleetwood* arose in the context of Chapter X proceedings does not diminish their relevance here.

7. Carol's attempt to vacate the stay of state eviction proceedings is not inconsistent with

its demands for payment of rent. Under Section 751(1) of the N.Y. Real Property Actions and Proceedings Law (McKinney 1963), payment of rent is a valid defense to an action for eviction and rent arrears.

ment to accept payment. And under Article 63 of the lease, Carol continued to be bound even in the event of a bankruptcy adjudication as long as the rent was· paĭd. The cumulative effect of these facts lends weight to Queens' estoppel argument. We do not rest our decision on this ground, however, for we find persuasive those cases relied upon by the district court which hold a lease termination provision to be unenforceable when compelling equitable and policy considerations so require.

In re Fleetwood Motel Corp., *supra*, involved a Chapter X reorganization of a publicly owned hotel corporation. In refusing to order a debtor from possession pursuant to a lease forfeiture provision similar to the instant one, the court held that the validity of the clause on its face under Section 70(b), without more, was insufficient to justify enforcement. The court proceeded to consider whether forfeiture was reasonable when balanced against competing public interest considerations and whether it was consistent with the purposes of the Act. It concluded that, since termination would result in a windfall surrender to the landlord of the corporation's only assets (the hotel and its fixtures), would vitiate the reorganization proceedings and would cause an unnecessary loss to the investing public, enforcement of the forfeiture clause would be inequitable and would be inimical to the purposes of Chapter X.

In Weaver v. Hutson, *supra*, upon facts similar to those in *Fleetwood*, the court also refused on equitable grounds to enforce a lease termination provision. The court in *Weaver* looked beyond the validity of the forfeiture provision on its face. It considered the effects of enforcement upon the debtor and the public, and whether termination would be consistent with the purposes of the Act. In denying rehearing, the court summarized the basis of its decision:

"The fundamental bases [sic] of decision throughout was that the Landlords' insistence upon a forfeiture was highly unconscionable and inequitable in the circumstances—a demand for blood. The conclusion generally was that as a court of equity the bankruptcy court had the discretion and power to refuse enforcement of [the forfeiture provision]. . . . Furthermore, we declined forfeiture in the circumstances as defeating the reorganization aims of Chapter X." 459 F.2d at 745.

We recognize that *Fleetwood* and *Weaver* are distinguishable on their facts from the instant case. Queens is not a publicly held corporation.[8] The benefit to the landlord here, in terms of a substantially higher rental income, is different from that in *Fleetwood* and *Weaver* where the landlords stood to acquire substantial *tenant* assets. Despite these and other factual differences, we find the rationale of those cases to be applicable here.

The purpose of a Chapter XI arrangement, as with a Chapter X reorganization, is to preserve a viable business enterprise where possible and especially when that will be in the "best interest of . . . creditors." 11 U.S.C. § 766 (1970). See In re Peoples Loan & Investment Co., 410 F.2d 851 (8 Cir. 1969). Cf. 9 Collier, Bankruptcy ¶ 9.17, at 281 (14th ed. 1972). In determining whether to enforce the lease termination here, therefore, we must consider not only the interests of the landlord but also those of the debtor and its creditors. Possession by Queens will not prejudice Carol, which is protected by a sizeable security deposit, except to deny it a windfall in the form of increased rent to which we hold it is not equitably entitled. Enforcement of the forfeiture, on the other hand, would destroy a now profitable debtor by depriving it of its

---

8. The fact that the SEC appeared on behalf of the shareholders in *Fleetwood* and *Weaver* and not in the instant case is but another distinction between a Chapter X reorganization and a Chapter XI arrangement. The SEC has certain statutory responsibilities under the former, none under the latter.

most valuable asset—its location. It also would needlessly injure trade creditors and those outside investors who have furnished capital which has resulted in Queens' rehabilitation. In our view, these individuals stand on no less significant a footing than did the shareholders of the debtors in *Weaver* and *Fleetwood.*

Our decision clearly is distinguishable from and in no way inconsistent with those cases which have upheld a termination clause such as that in the instant case. E. g., Finn v. Meighan, *supra,* 325 U.S. at 301; Model Dairy Co., Inc. v. Foltis-Fischer, Inc., 67 F.2d 704, 706 (2 Cir. 1933). Cf. B.J.M. Realty Corp. v. Ruggieri, 326 F.2d 281, 282 (2 Cir. 1963). In none of these cases would forfeiture have "seriously impaired", let alone totally frustrated, an arrangement by depriving the debtor of an asset absolutely necessary to its continued viability. Compare Finn v. Meighan, *supra,* 325 U.S. at 302. Nor would relief from forfeiture in any of these cases have caused no harm whatsoever to the landlord. And in none of these cases did the landlord reject tender of the full amount of the rent due before any court had adjudicated its rights under the lease.

■ Our decision does not deprive Section 70(b) of its statutory effect in those cases to which it is applicable. Bankruptcy forfeiture provisions are necessary for the protection of landlords and generally are enforceable. We hold only that, under the particular circumstances of this case, termination of Queens' lease would be grossly inequitable and contrary to the salutary purpose of Chapter XI.

Affirmed.

HAYS, Circuit Judge (dissenting):

I dissent.

The applicable federal statute, 11 U.S.C. § 110(b), states clearly that a covenant like the one used here is enforceable. The courts have created two exceptions to this rule. The first is where the landlord has waived his rights. There is no waiver here. The second is where enforcement would run contrary to a strong public interest. Smith v. Hoboken R.R., Warehouse & S.S. Connecting Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); Weaver v. Hutson, 459 F.2d 741 (4th Cir. 1972), cert. denied, 409 U.S. 957, 93 S.Ct. 288, 34 L. Ed.2d 227 (1973); In re Fleetwood Motel Corp., 355 F.2d 857 (3d Cir. 1964). *Smith,* the only such case decided by the Supreme Court, is clearly distinguishable from the instant case. It involved important considerations under the Interstate Commerce Act and a degree of public interest with which this case cannot compare.

*Weaver* and *Fleetwood Motel,* even if they were correctly decided, are also distinguishable in that forfeiture in those cases would have created a windfall to the landlords by virtue of improvements on the leased properties. This fact was especially important because the debtors were publicly held and forfeiture would have resulted in loss to innocent shareholders. In both cases the SEC appeared on behalf of the shareholders. This underscores the public interest involved in those cases. There is nothing approaching that degree of public interest in this case.

To affirm here would essentially deprive section 110(b) of any force. The claim that a liquor store involves the public interest is frivolous. The interest of the creditors is no different from what it would be in any bankruptcy proceeding. There is no windfall to the landlord here other than higher rent from a new tenant, and this "windfall" is present in every case like this because the landlord would never terminate the lease unless he could relet at a higher rent. If section 110(b) does not apply here, it is hard to imagine a case where it would apply.