In the Matter of HOUGH MANUFAC-
TURING CORPORATION, Debtor.

Donald W. HELGESEN, Plaintiff,

v.

HOUGH MANUFACTURING CORPORA-
TION, and Super Steel Products
Corporation, Defendants.

Bankruptcy No. 79–00765.

United States Bankruptcy Court,
W. D. Wisconsin.

Sept. 10, 1979.

Thomas G. Ragatz, Madison, Wis., and Thomas L. Shriner, Jr., of Foley & Lardner, Milwaukee, Wis., for plaintiff, Donald W. Helgesen.

Daniel W. Howard and Russell A. Eisenberg, of Howard, Peterman & Eisenberg, S.C., and Jerry H. Friedland, of Frisch, Dudek & Slattery, Ltd., Milwaukee, Wis., for defendant, Hough Manufacturing Corp.

Robert E. Cook of Cook & Franke, S.C., Milwaukee, Wis., for defendant, Super Steel Products Corp.

## OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

This is an action by a landlord, Donald W. Helgesen, to terminate leases ("the leases") to Hough Manufacturing Corporation, a Chapter XI debtor, and to recover possession of the premises from Hough and its alleged sublessee, Super Steel Products Corporation, on the basis of a "bankruptcy clause" or "ipso facto" clause of the leases. Hough had manufactured folding walls and operable partitions for many years prior to 1976 when it expanded its operations to include the manufacturing of metal partitions. In 1978, Hough expanded further to manufacture toilet partitions. Although Hough's business in the folding wall and operable partition line have continued to be profitable, the metal partition line and the toilet partition line have shown considerable losses during their operation by Hough. All of Hough's operations are carried on in premises leased to Hough by Helgesen at 1809 Adel Street, Janesville, Wisconsin. The folding wall and operable partition line occupies approximately 144,000 square feet of the 286,000 square foot premises.

At its present operating level, Hough is approximately the seventh largest employer in the Janesville area, employing approximately 184 employees. Hough is a closely held corporation in which the largest block of its stock, 42 percent, is owned by Super Steel. James Dorman and Michael Borden, the two primary executive officers of Hough, each own stock, the combined total of which is 28 percent of Hough's outstanding stock. Borden, Dorman and Super Steel are joined in a voting trust respecting their Hough stock which by its terms require that the vote of any two of the members of the trust controls the vote of the entire trust. Super Steel is also a supplier of Hough and a partial guarantor of Hough's indebtedness to its primary secured lender, First Wisconsin Financial Corporation.

On June 22, 1979, Hough filed its petition under Chapter XI of the Bankruptcy Act. Rent due under the leases was substantially current at the time of filing. Hough did not pay rent due under the leases on July 1 and on August 1 when those payments were due, but that rent was paid prior to September 1, 1979.

No plan has been filed by Hough in this Chapter XI proceeding. Representatives of Hough have stated in this Chapter XI proceeding that they believe that sale of the metal partition line and the sale of the toilet partition line and the sublease of approximately one-half of their building which presently houses those lines would be necessary for the proposal of any plan of reorganization. On or before August 31, 1979, Hough wound down and terminated operation of the metal partition line and the toilet partition line.

Movement of Hough's manufacturing equipment and office would be very expensive, both in actual expenses of moving and in losses occasioned by the down time involved. Hough does not presently have adequate cash flow to pay currently the costs of a move. The requirement that Hough move its operations, if such a move could be accomplished, would significantly diminish the prospects of a successful reorganization of the debtor.

On August 8, 1979, Hough applied for and received an order authorizing it as debtor-in-possession to enter into an agreement to sell its toilet compartment line and its paint line and blanking operations to Super Steel essentially upon the terms of an offer to purchase attached to that application. That order for agreement provided that approval of the Creditors Committee, the secured lenders and the Court be obtained for any material modifications in the offer to purchase. Contemporaneous with the order for agreement, Hough, as debtor-in-possession, applied for and received an order authorizing Hough to enter into an agreement to sublease to Super Steel the portion of the premises in which the toilet compartment and paint line operations as well as the blanking operations were conducted. Continued negotiations between Hough and Super Steel resulted in draft agreements received for review on or about August 10, 1979, and August 28, 1979. Each draft varied in its terms from the offer to purchase and the previous draft. When the trial in this matter began on September 5, 1979, there was no final draft agreement between Hough and Super Steel signed or ready for signature. After trial resumed on September 6 at 3:00 p. m., a final agreement for purchase of the described lines and a sublease and assignment of interest in the leases (jointly, "the Super Steel agreement") were signed and received in evidence. No approval has been given any draft nor the Super Steel agreement by the Creditors Committee or the Court.

Within a week prior to trial of this adversary proceeding, Sol Padek became aware that Hough as debtor-in-possession intended to sell some of its product lines. Sol Padek is a semi-retired entrepreneur with experience in purchasing and rejuvenating insolvent businesses. On September 4, 1979, Padek and Authur Sadoff toured the Hough premises with Helgesen. Thereafter, Helgesen delivered to Padek on Helgesen's stationery a signed memorandum ("the Helgesen memorandum") dated September 4, 1979, the entire text of which is:

I, the undersigned owner of an office and manufacturing facility of approximately 286,000 sq. ft. at 1809 Adel Street, Janesville, Wisconsin, agree to enter into a lease with the Sadoff-Padek Group for a term not to exceed 15 years at an annual rental rate of not less than $390,000 on a net, net, net basis.

Consummation of said lease is subject to said Sadoff-Padek Group being able to purchase all the assets of Hough Manufacturing Corporation on or before October 1, 1979.

Both Padek and Helgesen testified that the conditions in the second paragraph of the Helgesen memorandum were intended not to limit Helgesen's commitment to the sale of *all* of Hough's assets, and that the commitment was intended to be and would be honored if those assets identified for sale in the Super Steel offer to purchase were purchased.

On September 5, 1979, while on the witness stand, Mr. Padek signed a draft agreement ("the Padek agreement") which had been drafted at his request between Hough Manufacturing Corporation, debtor-in-possession, and Sol Padek as principal and as agent for a corporation to be formed. The Padek agreement was styled after the then most current draft of what was later the Super Steel agreement and was intended to be substantially identical to that draft except for its provisions requiring Padek (a) to lease the building from Helgesen and sublease approximately 144,000 square feet thereof to Hough on the same terms for such space as provided in the leases between Helgesen and Hough; (b) to pay $50,000 additional purchase price for Hough's product lines and $30,000 additional purchase price for Hough's blanking op-

erations; (c) to provide as security for promissory notes given under the terms of the agreement unconditional letters of credit as to each required installment. The Padek agreement had not been presented to Hough prior to trial either in draft form or as signed. Hough had not signed the Padek agreement. Padek stated that Sadoff and others unnamed would be participants with him as purchasers under the terms of the Padek agreement.

█ The sole issue to be decided in this case is whether the provisions in the leases, stated as,

if lessee shall file a petition in bankruptcy or have an involuntary petition in the bankruptcy filed against it or shall make an assignment for the benefit of creditors or become involved in an insolvency proceeding, the lessor shall have the right to terminate this agreement with immediate effect,

and also stated as,

if Hough shall file a petition in bankruptcy or have an involuntary petition in bankruptcy filed against it or shall make an assignment for the benefit of creditors or become involved in insolvency proceedings, Helgesen shall have the right to terminate this agreement with immediate effect,

should be enforced in this Chapter XI proceeding.

Section 70b of the Bankruptcy Act provides:

. . . an express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same is enforceable . .

Section 70b is applicable to Chapter XI cases by virtue of § 302 of the Bankruptcy Act. In its consideration of § 70b, the United States Supreme Court in *Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624, upheld the clear meaning of the language of § 70b and enforced a lease forfeiture against a debtor in Chapter X. However, the broad equitable powers of the Bankruptcy Court have been successfully invoked to grant relief from forfeiture when under the particular circumstances of the case termination of the lease would be grossly inequitable and contrary to the salutary purpose of Chapter XI. *In re Queens Boulevard Wine and Liquor Corp.*, C.C.A. 2, 503 F.2d 202.

█ Cases supporting both the rule arising from § 70b of the Bankruptcy Act and the exceptions based on equity of which *Queens Boulevard* is the premier example, have been fully and ably presented by the excellent briefs of counsel for the parties and for the Creditors Committee appearing *amicus curiae.* In the only case on the issue decided in this district, *In re LaCrosse Flite Center, Inc.*, 10 C.B.C. 856, 2 B.C.D. 1547 (1976), Judge Doyle articulated the standard which must be applied,

. . . bankruptcy courts can decide not to enforce such lease provisions against a bankrupt tenant where the landlord has waived the right to terminate the lease or where termination would work a substantial injustice to the lessee and would serve only to frustrate the reorganization purpose of the Bankruptcy Act.

There is neither allegation nor proof of waiver in this case. Therefore, to be entitled to an exception of the rule of § 70b Hough and/or Super Steel must show that termination of the leases would work a substantial injustice to Hough and serve only to frustrate the reorganization purpose of the Bankruptcy Act.

The *LaCrosse Flite* decision distilled from *Smith v. Hoboken R.R., Warehouse & Steamship Co.*, 328 U.S. 123, 131–32, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); *In re Fontainebleau Hotel Corp.*, 515 F.2d 913, 914–16 (5th Cir. 1975); *Queens Boulevard Wine and Liquor Corp. v. Blum*, 503 F.2d 202, 205–07 (2d Cir. 1974); *Weaver v. Hutson*, 459 F.2d 741, 743 (4th Cir. 1972); *In re Fleetwood Motel Corp.*, 335 F.2d 857, 862 (3d Cir. 1964), five factors for consideration in deciding whether a termination clause would work a substantial injustice or serve

to frustrate the purposes of a reorganization:

(1) a termination of the lease would terminate the business of the defendant;

(2) a public interest in the business of the defendant would be lost;

(3) a public investment in the stock of the defendant would be lost;

(4) a termination of the lease would not save the landlord from any injury but only provide him the opportunity to obtain a higher rent or to acquire improvements or fixtures and equipment of the defendant;

(5) a history of prompt rental payment by the defendant and a large security deposit held by the landlord to secure defendant's obligations under the lease suggest unfairness to the lessee if the lease is terminated.

The factors must be considered individually. First, although defendants argued that termination of the lease would be a termination of the business of Hough, there is substantial evidence to the contrary. Super Steel's chief executive officer has testified that if the leases are terminated, Super Steel neither will go through with the Super Steel agreement nor take any further steps to assist Hough in its reorganization. The contention follows that without the Super Steel agreement and sublease, Hough will be unable to continue in business or effect reorganization. The testimony regarding Super Steel's intention to cooperate with Hough no further in the reorganization would appear a probable exaggeration in light of Super Steel's high stakes as shareholder, supplier and guarantor of Hough.

No plan of reorganization has been presented in this Chapter XI proceeding so the effect of Super Steel's position on the reorganization can only be evaluated in terms of the general outline of reorganization presented by Hough. That outline provides for the sale of Hough's unprofitable product lines and reduction of its real estate rental obligations. Those objectives appear to be met by the Padek agreement on terms essentially similar to the terms of the Super Steel agreement.

There is no need to compare in detail the Super Steel agreement and the Padek agreement. It is sufficient to recognize that both would, if accepted by Hough and approved by the Creditors Committee and the Court, provide Hough with a foundation for reorganization as outlined by Hough. Certainly, delay and down time on the lines to be sold by Hough and acquired pursuant to the Super Steel agreement or the Padek agreement would be expensive. However, the express willingness of both prospective purchasers to act expeditiously is a matter of record and there is no evidence that delays in implementation within the range contemplated under the Padek agreement, stated by Mr. Padek to be two to three weeks, would be sufficient to cause termination of Hough as a going business.

The principal evidence that Hough would be terminated is directed to the situation arising if Hough were required to move its profitable folding wall and operable partition line. In light of the existence of the Padek agreement, the finding that such a move is necessary is not compelled by the evidence. The willingness of Helgesen to cooperate in new lease arrangements with prospective purchasers is evidenced both by the testimony of Helgesen to that effect and by the Helgesen memorandum. If Hough were permitted to remain in its present location as it would appear to be able to do under the Padek agreement and the Helgesen memorandum, there is no evidence that the business would be terminated.

Even if the Padek agreement is only an offer which might prior to acceptance by Hough be modified or revoked, there is no evidence that it is not an offer made in good faith. As a good faith offer, it provides strong evidence that there are alternatives to the Super Steel agreement potentially available which would not cause the termination of the business of Hough. At this early stage of the Hough reorganization, it is not reasonable to assume that the Super Steel agreement is the only probable route to success.

Second, there is a strong public interest in the continuation of Hough's business and its position as a major employer within its geographical area. However, without being able to predict that business of Hough would be terminated by the termination of the leases, it is impossible to determine with certainty whether position as an employer would be changed. To assume that change without convincing proof thereof would be an error. If the business continued, there is no evidence that a public interest would be lost.

Third, as a close corporation, Hough's reorganization or liquidation would have no effect on public investment in its stock.

Fourth, no substantial injury to the landlord has been demonstrated which termination of the leases would prevent. Although Helgesen has been directly and negatively affected by an increase in interest rates on his financing of the Hough building subsequent to his entering into the leases, those negative effects are not directly related to the cause alleged for the termination of these leases. The present financing, although at a high interest rate, is available for approximately four more years and was entered into prior to any claim of default or any statement of termination of the leases. The fact that a higher rental might be obtained at this time from another tenant does not constitute an injury to the landlord.

Fifth, Hough has brought itself current in rent due under the leases and as debtor-in-possession is operating under an order requiring current payments of rent and the escrow of a sum estimated sufficient to pay real estate taxes for the period of occupancy. Prior to filing a Chapter XI, Hough had a record of timely rent payments. There is no evidence that Helgesen holds any security deposit to secure Hough's obligations under the leases.

■ In summary, the review of the factors set out in *LaCrosse Flite* indicated that only the last two of the five factors favoring the avoidance of the termination clause have been shown to exist in this case. Absent the other factors and principally the demonstration that termination of the leases will terminate the business, there has been no substantial showing that termination of the leases will frustrate the reorganization of Hough. Thus although no substantial injury would be done to the plaintiff if the termination clause were not enforced, there has been no showing that a substantial injustice would be done to Hough or to its creditors by the termination of its lease. Absent such a showing, the clear meaning of § 70b of the Bankruptcy Act ought not be avoided.

### ORDER

Upon the foregoing Opinion which constitutes my findings of fact and conclusions of law in this matter, it is hereby ·

ORDERED that the leases to premises occupied by the debtor, Hough Manufacturing Corporation, at 1809 Adel Street, Janesville, Wisconsin, have been terminated; and it is further

ORDERED that the premises be vacated and the possession surrendered to the landlord, Donald W. Helgesen, within sixty days.