In the Matter of CURIO SHOPPES, INC., Debtor.

Bankruptcy No. 2–85–00171.

United States Bankruptcy Court, D. Connecticut.

Nov. 8, 1985.

state law prior to the bankruptcy filing so as to preclude its assumption.[2]

## II.

## PROCEDURAL AND FACTUAL BACKGROUND

These questions procedurally arise from two motions. One, by Curio Shoppes, Inc. (debtor), the debtor-in-possession in this chapter 11 case, seeks authorization to assume a lease from Irving Eisenbaum (landlord). The motion, dated May 6, 1985, was received by the bankruptcy court on May 14, 1985. The motion alleges that the debtor, the operator of a restaurant business, is in possession under a lease of premises located in a shopping center in Bristol, Connecticut, and that assumption of the lease is necessary for the debtor's reorganization. By motion dated May 24, 1985, and filed on May 28, 1985, the landlord moved for possession of the premises. He asserts that an order for relief in the case had entered on March 7, 1985, the date the debtor filed its chapter 11 petition, and that the debtor having failed to assume the lease within 60 days from March 7, 1985, the landlord is entitled to immediate possession.

The hearings on both motions, originally set down by the court for June 5, 1985, were continued by agreement to August 14, 1985, when the parties appeared and a trial was held. At that time, the landlord raised the matter of whether a lease was in existence on March 7, 1985, the date of the bankruptcy petition. Each party has submitted a post-trial memorandum setting forth its claims of law based upon the following facts established at trial.

The lease between the debtor and the landlord covers a portion of a building in a shopping center known as Shop-Rite Plaza,

Martin W. Hoffman, Hartford, Conn., for debtor-in-possession.

Eugene M. Kagan, Hartford, Conn., for Irving Eisenbaum, Landlord.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

## I.

## ISSUES

The principal issue in this proceeding is whether equitable considerations may be employed in a chapter 11 reorganization case in applying a recent amendment to the Bankruptcy Code—11 U.S.C. § 365(d)(4)—which grants a landlord of nonresidential real property the right to possession when a lease is not timely assumed.[1] Before reaching that issue, the court must first rule on the landlord's contention that the lease in question was terminated under

1. Section 365(d)(4) provides in pertinent part: "..., if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor."

2. Section 365(c)(3) states that a lease may not be assumed if "such lease of nonresidential real property has been terminated under applicable nonbankruptcy law prior to the order for relief."

located in Bristol, Connecticut (premises); has a five-year term dating from August 1, 1982, with an option to extend for five years at increased rental; and restricts the use of the premises to operation of a restaurant. The debtor is obligated to pay monthly rent of $1,250.00, common area service charges, and a pro rata share of insurance costs and real estate taxes. On August 1, 1982, the date the lease was executed, the debtor had three stockholders—Dean Harper, his brother Scott Harper, and Ron Uricioli. Dean Harper and Uricioli owned a majority of the common stock. After the first lease year, the restaurant did not prosper and in August 1984 Dean Harper and Uricioli transferred their stock, for no consideration, to Scott Harper and his wife, Sheryl Harper (Sheryl). Paragraph 14 of the lease generally prohibits assignment of the lease without the landlord's consent and includes the following provision:

> If tenant is a corporation and if any transfer, sale pledge or other disposition of the common stock shall occur, or power to vote the majority of the outstanding capital stock be changed, then tenant shall so notify landlord and landlord shall have the right at its option to terminate this lease upon five days' notice to tenant.

During September 1984, Sheryl discussed with the landlord the details of the recent stock transfer from her brother-in-law and Uricioli to herself and her husband. The landlord took no action and continued to accept monthly rental payments until January 23, 1985. On that date, the landlord sent a letter (not introduced into evidence) to the debtor claiming the lease had been terminated because of the stock transfer.

The landlord sent a second letter to the debtor on January 23, 1985, requesting the debtor to pay $901.58 as its pro rata share of taxes. The lease provision concerning reimbursement to the landlord of real estate taxes and insurance states:

> Landlord will provide Tenant with paid receipts of these two items and Tenant

has thirty (30) days to reimburse Landlord for their pro rata share. In the event Landlord does not receive payment within the said thirty (30) day period, the lease is automatically cancelled.

Sheryl sent the February 1985 monthly rent check to the landlord, but he returned the check to her under a letter dated February 7, 1985, which read:

> Enclosed find your tendered rental payment for the above captioned premises, for the month of February 1985. I am returning this check because your lease has been cancelled by letter of January 23, 1985, copy to your attorney. This is demand on you to please vacate the premises.

Apparently flustered by the return of the February rent check and a request for the tax check, Sheryl did nothing[3] until the landlord sent the following letter to the debtor on February 23, 1985.

> I enclose copy of letter sent to you on January 23, 1985 requesting payment of Real Estate Taxes on the portion of space Curio Shoppes occupies at Shop-Rite Plaza in Bristol, Conn. I also enclose Addendum to Lease which states you have 30 days to pay this bill. *You did not tender payment.* Now, the lease has previously been cancelled because of Paragraph 14 of the existing lease and this makes a double cancellation. You are hereto notified to quit the premises.

On February 27, 1985, Sheryl resubmitted to the landlord the February rent check together with a check for the taxes. The landlord retained both checks, but did not cash them. The debtor mailed the rent to the landlord for all subsequent months, which checks he retains uncashed. During a meeting in February, the landlord advised Sheryl that the best thing for the debtor would be to file a chapter 11 petition.

The debtor's restaurant is a full-service, family-style restaurant, employs 15 people, and is open from 5:30 a.m. to 8:00 p.m.

---

**3.** There was no evidence that the debtor's failure to pay resulted from a shortage of funds.

The debtor has explored moving the restaurant to other locations in the area, but no rentals are available at anything near the rent the debtor is currently paying. The cost of moving the restaurant, kitchen equipment, furnishings and fixtures would be prohibitive. Since the filing of the bankruptcy petition, the restaurant has made a modest profit. The debtor intends to propose a plan paying a 25% dividend over time to unsecured creditors. If the debtor were to be liquidated, there would be no dividend. The landlord has offered to relocate the restaurant to another store within the shopping center, but at double the rent per square foot that the debtor is now paying.

The debtor's attorney who filed the bankruptcy petition prepared the debtor's motion for authorization to assume the lease. He testified he prepared it on May 6, 1985, and instructed his staff that it be mailed immediately. As noted, the motion arrived at the bankruptcy court on May 14, 1985. Counsel for neither party questioned the debtor's attorney as to why he waited until May 6, 1985 to prepare the motion for authority to assume the lease, and no explanation was offered for the eight days it apparently took the motion to reach the bankruptcy court on May 14, 1985.

### III.

### WAS THE LEASE TERMINATED PRIOR TO BANKRUPTCY FILING?

The landlord claims that there was no lease for the debtor to assume at the time the debtor filed the petition. He contends that by virtue of the debtor's pre-petition violation of the lease provisions concerning stock transfer and payment of real estate taxes, the lease has terminated. For the reasons stated below, I find that the lease was in effect on the date the debtor filed its petition.

### A.

### THE STOCK TRANSFER

The debtor notified the landlord of the August 1984 stock transfer early in September 1984. The transfer, for no consideration, made Sheryl and Scott Harper the sole stockholders after the other two stockholders left the business. The landlord registered no complaint and accepted the rent checks the debtor tendered for the remainder of 1984. It was not until January 1985 that the landlord informed the debtor that he considered the lease terminated by reason of the stock transfer.

Under Connecticut law, a landlord's acceptance of rental payments by a tenant constitutes a waiver, absent evidence to the contrary, of any prior lease default of which the landlord has knowledge. *Xanthakey v. Hayes*, 107 Conn. 459, 468, 140 A. 808 (1928). Acceptance of rent does not imply a waiver of a continuing breach or future breaches by the tenant, *Club Road Corp. v. Whitehead*, 34 Conn.Sup. 580, 584, 378 A.2d 110 (1977); it does, however, constitute a waiver of any prior breach, whether due to non-payment of rent or otherwise. *Segall v. Gagliardi*, 103 Conn. 497, 502, 130 A. 896 (1925) ("While all of our decided cases have arisen over the breach of the covenant to pay rent, the rule of waiver applies equally to every form of covenant in the lease"). I conclude that there was a waiver by the landlord and that the lease was not in default on the date of the bankruptcy petition on account of the stock transfer made in August 1984.

### B.

### PAYMENT OF THE REAL ESTATE TAXES

The debtor was obligated by the lease to pay its pro rata share of the real estate taxes 30 days after notification. The landlord's return of the February 1985 rent check together with the landlord's request for a check for taxes understandably confused the debtor. In any event the landlord received and retained the tax check, together with a rent check in February. He also received and retained the March rent check. Even if, under the above circumstances, the debtor's failure to pay the taxes within 30 days after notice

was a material default, the landlord's receipt and retention of the subsequent rent checks constitute a waiver, as in the case of the stock transfer.

The landlord makes the further claim in this instance that he did not cash the checks tendered by the debtor despite having retained them. Retention of checks is sufficient under Connecticut law to renew the tenancy and waive the default. *Borst v. Ruff,* 137 Conn. 359, 361–62, 77 A.2d 343 (1950).

## C.

### EQUITABLE CONSIDERATIONS

Connecticut courts have traditionally employed equitable principles in lease termination matters. *F.B. Fountain Co. v. Stein,* 97 Conn. 619, 626–27, 118 A. 47 (1922) ("... [E]quity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease"). *See also Nicoli v. Frouge Corp.,* 171 Conn. 245, 247, 368 A.2d 74 (1976); *Galvin v. Simons,* 128 Conn. 616, 620, 25 A.2d 64 (1942); *R & R of Connecticut, Inc. v. Stiegler,* 4 Conn. App. 240, 243–45, 493 A.2d 293 (1985). It is clear to me that even in the absence of waiver, under the circumstances in this matter, no Connecticut court would enforce a forfeiture of the lease.[4]

---

**4.** Even if a default had existed, the question would remain whether the landlord terminated the lease under Connecticut law. In order to effect termination of a lease, the landlord must perform some unequivocal act that clearly demonstrates his intent to terminate. *Tseka v. Scher,* 135 Conn. 400, 404, 65 A.2d 169 (1949). This can be accomplished by exercising his right to re-enter upon default, *Bowman v. Foot,* 29 Conn. 331, 339 (1860), or by serving upon the tenant a statutory notice to quit, *Kligerman v. Robinson,* 140 Conn. 219, 222, 99 A.2d 186 (1953). In Connecticut, no other method has yet been ruled sufficient to terminate a lease. No case supports the landlord's contention that his pre-petition acts terminated the lease. *See Sandrew v. Pequot Drug, Inc.,* 4 Conn.App. 627, 631–32, 495 A.2d 1127 (1985).

## IV.

## SECTION 365(d)(4)

### A.

### COMPLIANCE

Did the debtor comply with § 365(d)(4) when it mailed its motion for authority to assume the lease on May 6, 1985, the sixtieth day after the date of the order for relief?[5] The courts to date are divided, *compare In re By-Rite Distributing, Inc.,* 47 B.R. 660, 669 (Bankr.D.Utah 1985) *with In re Unit Portions of Delaware, Inc.,* 53 B.R. 83, 13 Bankr.Ct.Dec. 635, 636–37 (Bankr.E.D.N.Y.1985); *In re Bon Ton Rest. & Pastry Shop,* 52 B.R. 850, 13 Bankr.Ct.Dec. 628, 630 (Bankr.N.D.Ill. 1985), on whether the debtor must actually secure a court order authorizing assumption of the lease within 60-day period set by § 365(d)(4). No court or other authority has found it necessary to discuss the obvious requirement that a motion for authority to assume be at least filed within the 60 days. Bankr.R. 5005(a) provides that all motions "shall be filed *with the clerk of the court* in which the case under the Code is pending." (Emphasis added.) The courts that have considered the question in other contexts have held that in the absence of a controlling statute or regulation, the filing of a document is effective only upon that document's receipt by the court.[6] If the debtor mailed its motion for authority to assume on May 6, 1985, that motion was not timely filed. The debtor has not argued to the contrary.

---

**5.** 11 U.S.C. § 301: "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter."

**6.** *United States v. Lombardo,* 241 U.S. 73, 76–77, 36 S.Ct. 508, 509, 60 L.Ed. 897 (general definition of filing); *Mixon v. Anderson (In re Ozark Restaurant Equip. Co., Inc.),* 761 F.2d 481, 482 n. 1 (8th Cir.1985) (filing of appeal from bankruptcy court); *In re Nimz Transp., Inc.,* 505 F.2d 177, 179 (7th Cir.1974) (filing of proof of claim); *United States v. Missco Homestead Ass'n,* 185 F.2d 283, 285 (8th Cir.1950) (filing of bankruptcy petition).

## B.

### EQUITABLE CONSIDERATIONS

■ We come now to the debtor's assertion that the bankruptcy court may employ its equitable powers in dealing with a situation such as the one under consideration here. The landlord contends that equitable powers may not be exercised in matters addressed by § 365(d)(4), and supports his position with the following statement from *In re By-Rite:*

> Thus, the Bankruptcy Code deems the leases to have been rejected and the estate's interest in them terminated by operation of law. Any other holding would lead to endless confusion, delay and uncertainty regarding the status of non-residential real property leases in bankruptcy cases, and would nullify the principal object of Congress in amending section 365. Equitable considerations do not permit the Court to flout the clear intent of Congress. *In re By-Rite, supra,* at 671.

After review of the legislative history of § 365(d)(4), and taking into account recognized principles concerning the use of equity in bankruptcy cases, I conclude and hold that bankruptcy courts may resort to equitable principles in considering enforcement of this statute.

Although not of controlling significance here, reference has already been made to Connecticut case law concerning the role of equity in lease forfeitures. This view is widely held—equity will play a part when it would be unconscionable to allow a forfeiture. *See Annot.,* 44 A.L.R.2d 1359, 1364–67 (1959). More important, the United States Supreme Court has stated that it does "not read [the Bankruptcy Code] with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

Testimony at trial revealed that two of the eight units in the shopping center in which the debtor operates are empty. The landlord is willing to allow the debtor to remain as a tenant in the shopping center, but at a substantially-increased rental which the debtor cannot afford and which would most likely undermine the reorganization. The debtor has met all monetary and use obligations under the lease, both before and after the commencement of the case. The debtor's prior losses resulting from mismanagement by former stockholders have been stemmed, and the employment of 15 persons is dependent upon the restaurant's continued operation.

Section 365(d)(4) enables lessors of nonresidential realty to terminate leases 60 days after the lessee files for bankruptcy, if the debtor-lessee has not by that time assumed the lease. The statute serves no essential purpose when the tenant is meeting all of its lease obligations, as in this case, and the landlord has not been misled as to the tenant's intentions. Although there are no conference reports accompanying the 1984 Act, the statement of Senator Orrin Hatch during the Senate discussion of § 365(d)(4) is instructive. According to Senator Hatch, § 365(d)(4) was proposed to respond to the problem of the harm incurred by shopping centers with empty stores of bankrupt tenants:

> The first problem which this bill would remedy is the long-term vacancy or partial operation of space by a bankrupt tenant. Although in a chapter 7 case the bankruptcy code presently requires that the trustee decide whether to assume or reject an unexpired lease within 60 days after the bankruptcy petition is filed, there is no deadline for this decision in a chapter 11 case. Because of the unprecedented number of bankruptcy cases and the consequent delays in the bankruptcy courts, tenant space has been vacated for extended periods of time before the bankruptcy court forced the trustee to decide whether to assume or reject the lease. During this time, the other tenants of the shopping center are hurt because of the reduced customer traffic in the shopping center. Tenants and landlords in other nonresidential structures have encountered similar problems.

The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by requiring that the trustee decide whether to assume or reject non-residential real property lease within 60 days after the order for relief in a case under any chapter. This time period could be extended by the court for cause, such as in exceptional cases involving large numbers of leases. One of the minor changes in this subtitle was to limit it to non-residential real property leases. If the lease is not assumed or rejected within this 60-day period, or any additional period granted by the court, the lease is deemed rejected and the trustee must immediately surrender the property to the lessor.

130 Cong.Rec.S. 8894–8895, *reprinted at* 1984 *U.S.Code Cong. & Ad.News* 576, 598–601.

This proceeding does not present the problem that § 365(d)(4) was designed to remedy. The debtor has not vacated the leased premises and wishes to assume the lease, not to assign it. There will be no problem of disruption of the shopping center's business. To allow the landlord to terminate the lease in this case would not serve the purpose of Congress in enacting § 365(d)(4), but only permit the landlord to take advantage of what appears to be a lawyer's miscalculation. The landlord had already received the debtor's motion to assume the lease when he filed his motion for possession of the premises, and he has not claimed any detriment attributable to the debtor's late filing.

Section 70b of the Act of 1898 (the Act) provided, in part, as does § 365(d)(4), that "any ... lease not assumed or rejected within [sixty days after adjudication of bankruptcy] shall be deemed rejected." The court in *In re By-Rite, supra,* at 670, noted that a conclusive statutory presumption of rejection arose under § 70b if the trustee failed to take affirmative action to assume within 60 days. *See In re Gravure Paper & Board Co.,* 234 F.2d 928, 930 (3d Cir.1956); *Ten-Six Olive, Inc. v. Curby,* 208 F.2d 117, 123 (8th Cir.1953). The generally accepted view, however, was that this portion of § 70b applied only in liquidation cases, and not in reorganizations. *See, In re Imperial "400" National, Inc.,* 429 F.2d 680, 682 (3d Cir.1970); *Texas Importing Co. v. Banco Popular de P.R.,* 360 F.2d 582, 584 (5th Cir.1966); *Title Ins. & Guar. Co. v. Hart,* 160 F.2d 961, 965–66 (9th Cir.), *cert. den.* 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947); 4A L. King, *Collier on Bankruptcy* ¶ 70.43 n. 23b (14th ed. 1976). *Cf. Wiemeyer v. Koch,* 152 F.2d 230, 234 (8th Cir.1945). Accordingly, the cases cited by the *By-Rite* court contain no discussion of whether the equitable purposes of reorganization, *see NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), may override the statutory presumption. I find that the cases under § 70b are not controlling.

I believe the present proceeding is governed by the holding in *Queens Boulevard Wine & Liquor Corp. v. Blum,* 503 F.2d 202 (2d Cir.1974). At the time of that case, another portion of § 70b provided that "an express covenant that ... the bankruptcy of a specified party ... shall terminate the lease or give the other party an election to terminate the same shall be enforceable." The Supreme Court, in *Finn v. Meighan,* 325 U.S. 300, 302–03, 65 S.Ct. 1147, 1149, 89 L.Ed.1624 (1945), held that this provision applied to reorganization proceedings under chapter X; therefore, bankruptcy termination clauses were enforceable in reorganization as well as liquidation. In *Queens Boulevard,* the lease between the debtor-tenant and the landlord contained an express covenant which the landlord invoked when the debtor filed a chapter XI bankruptcy petition. The debtor operated a retail liquor store, and its reorganization depended upon the store remaining at its location. Despite the unequivocal language of the Act and *Finn v. Meighan;* the court of appeals approved holdings from other courts [7] that bankruptcy courts

---

7. *Weaver v. Hutson,* 459 F.2d 741 (4th Cir.1972), *cert. den.* 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1973); *In re Fleetwood Motel Corp.,* 335 F.2d 857 (3d Cir.1964).

"are empowered to refuse enforcement of [such] lease provisions on the ground that termination would work a substantial injustice to the lessee and would serve only to frustrate the basic reorganization purposes" of bankruptcy law. *Id.* at 205. The court (Timbers, J.) went on to state:

> The purpose of a Chapter XI arrangement, as with a Chapter X reorganization, is to preserve a viable business enterprise where possible and especially when that will be in the "best interest of ... creditors." ... In determining whether to enforce the lease termination here, therefore, we must consider not only the interest of the landlord but also those of the debtor and its creditors. Possession by [debtor] will not prejudice [landlord], which is protected by a sizable security deposit, except to deny it a windfall in the form of increased rent to which we hold it is not equitably entitled. Enforcement of the forfeiture, on the other hand, would destroy a now profitable debtor by depriving it of its most valuable asset—its location. It also would needlessly injure trade creditors and those outside investors who have furnished capital which has resulted in [debtor's] rehabilitation. (citations omitted)

503 F.2d at 206–207.

Other courts of appeals have reached similar conclusions. *See Fisher v. City of Huntington Beach (In re Huntington, Ltd.),* 654 F.2d 578, 583–85 (9th Cir.1981); *Weil v. Lansburgh (Matter of Garfinkle),* 577 F.2d 901, 904–05 (5th Cir. 1978). I conclude that bankruptcy courts may resort to equity when literal enforcement of a directly applicable statute would frustrate the purposes of the reorganization, and relief to the debtor would not prejudice the landlord. The facts of this proceeding warrant the invocation of equity to relieve the debtor from forfeiture of the lease.

**8.** The debtor's further argument concerning the constitutionality of § 365(d)(4) need not be ad-

## V.

### CONCLUSION

A crabbed reading of § 365(d)(4) would give the landlord the right to immediate possession of the premises. Upon examination of the statute's purposes, I find that Congress did not contemplate such situations as the present one when enacting § 365(d)(4). The landlord's motion for immediate possession is denied, and the debtor's motion for authority to assume the lease is granted.[8]

I paraphrase *Queens Boulevard, supra,* at 207, when I state that this ruling is not intended to deprive § 365(d)(4) of its salutary effect in those cases to which it is applicable. Section 365(d)(4) was deemed necessary by Congress for the protection of landlords. The decision here is that under the particular circumstances of this case termination of the debtor's lease would be highly inequitable and contrary to the purpose of chapter 11.

This Memorandum shall constitute Findings of Fact and Conclusions of Law mandated by Rule 7052. It is

SO ORDERED.

dressed, in view of the court's ruling.