**In re SAPOLIN PAINTS, INC., Woolsey Marine Industries, Inc., Debtors.**

**Bankruptcy Nos. 180–01691–21, 180–01807–21.**

United States Bankruptcy Court, E. D. New York.

Aug. 6, 1980.

Robert L. Howard, New York City, for landlord.

Stroock & Stroock & Lavan, New York City, for debtor.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for Chemical Bank.

Weil, Gotshal & Manges, New York City, for Universal Paint Corp.

Marcus & Angel, New York City, Co-Attys., for Creditors' Committee.

Ballon, Stoll & Itzler, Spengler, Carlson, Gubar & Brodsky, New York City, for United Capitol Corp.

Davis, Polk & Wardwell, New York City, for Woolsey Creditors' Committee.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Sapolin Paints, Inc. ("Sapolin") and Woolsey Marine Industries, Inc. ("Woolsey"), debtors and debtors-in-possession, jointly applied for an order pursuant to § 365 of the Bankruptcy Code (11 U.S.C. § 365), authorizing the assumption and assignment of six leases. Arthur Gilbert, the owner of a building at 2750 South Garfield Avenue, Los Angeles, California, which is the subject of one of these leases (the "California Leasehold"), is objecting to such assumption and assignment.

## THE BACKGROUND

Sapolin filed a petition for an order of relief under Chapter 11 of the United States Bankruptcy Code on April 8, 1980; its wholly-owned subsidiary, Woolsey, filed under Chapter 11 on April 14, 1980. The Court ordered joint administration of the proceedings pursuant to Bankruptcy Rule 117(b), made applicable herein by Bankruptcy Rule 11–14, on April 23, 1980. They are engaged in a liquidating arrangement as permitted by 11 U.S.C. § 1123(b)(4).

On June 12, 1980, pursuant to an auction held in the courtroom, the bulk of the assets of the two debtors Sapolin and Woolsey were sold to United Capital Corp. ("United"), or its designee, for $2,600,000 plus the assumption of certain liabilities. Included in the assets sold were a manufacturing plant, a retail store, several leases of real property, inventory, machinery and equipment, trademarks and copyrights, patents, accounts receivable, secret formulae, and goodwill.

Because Sapolin is currently operating on borrowed money, the parties, under pressure from the creditors of Sapolin and

Woolsey, agreed to consummate the sale on July 7, 1980. Among the assets to be transferred were six leases owned by Sapolin or Woolsey.

In order to permit the closing to proceed as scheduled, Sapolin and Woolsey, on June 30, 1980, brought on by order to show cause, on five day's notice, a hearing on their right to assume and assign these six leases, pursuant to § 365 of the Code. As a result of the hearing, Sapolin and Woolsey were able to include in the scheduled closing all their unexpired leases and subleases, except the California Leasehold.[1]

With respect to the California Leasehold, counsel for Gilbert & Rothschild Co., the lessor named in the lease, filed a "Memorandum in Opposition," claiming the existence of defaults under the lease precluding its assumption or assignment, "among others, in that pursuant to paragraph 17 of that certain lease described above, Sapolin Paints, Inc. has vacated and abandoned the leased premises and Arthur Gilbert has the right to terminate the lease and retake possession of the property."

When it appeared that the controversy respecting the assumption and assignment of the California Leasehold might delay the closing indefinitely, the debtors-in-possession, the purchaser, the creditors' committees, and Chemical Bank, a secured creditor herein, entered into a stipulation to exclude this lease temporarily from the sale. The purchase price has been reduced by $230,000 pending disposition of this proceeding.

## THE FACTS

The California Leasehold covers a building containing 69,350 square feet located in Commerce City, Los Angeles County, California. It is for a term of 25 years, which

---

1. One landlord failed to appear in response to the debtors' application to assume and assign his lease. Three of the landlords consented to the assignment of their respective leases upon the curing of any defaults, to which United agreed. Universal Paint Corp., the sublessee of the California Leasehold, consented to the assumption and assignment of the sublease after testimony was taken on July 1 and 2, 1980 on adequate assurance of future performance by Metropolitan, the assignee of the sublease. On July 7, 1980, the Court entered an order in which it authorized the assumption and assignment of the five leases, directed the debtors-in-possession to cure any existing defaults in the leases, and found the landlords to be adequately protected.

will end on September 30, 1989, with an option to renew for another ten years. The rental is payable in four equal quarterly installments, and currently amounts to approximately $56,000 per year, or about 81 cents per square foot per year. The prevailing market rate for similar space is $2.88 per square foot.

The building was erected for use by a paint manufacturer. The lease provides that it is to be used for "manufacturing, warehouse and offices." About 10,000 feet of the building consists of prime office and laboratory space.

Sapolin, with the consent of the landlord, acquired the lease by assignment from Luminal Paints, Inc. on August 26, 1977. The present owner of the leased property is Arthur Gilbert, who acquired it from the original lessor, Gilbert & Rothschild Co., on August 16, 1965.

Section 17(c) of the lease gives the landlord the option of terminating it on the occurrence of a variety of conditions.

The lessor, at his election, and upon notice to the lessee of his intention, may terminate the lease and retake possession of the premises:

"(c) if the Lessee (1) is adjudicated a bankrupt or insolvent, or (2) has a receiver appointed for all or substantially all of its business or assets, or (3) has a trustee appointed for it after a petition has been filed for Lessee's reorganization under the Bankruptcy Act of the United States known as the Chandler Act or any future law of the United States having the same general purpose, or (4) if the Lessee shall make an assignment for the benefit of its creditors"

He may also terminate under Paragraph 17(c):

"(5) if Lessee shall vacate or abandon the leased premises."

If either of the foregoing occurs:

"then in any such event the Lessor shall have the right at its election, then or at any time thereafter, and while such default or defaults shall continue, to give the Lessee notice of Lessor's intention to terminate this lease and retake possession and thereupon all Lessee's rights granted Lessee hereunder shall come to an end, as fully as if such date were the last day of the whole term hereinabove specified, and the Lessee hereby covenants peaceably and quietly to yield up and surrender to the Lessor said leased premises and all structures, buildings, improvements and equipment located thereon, and to execute and deliver to Lessor such instrument or instruments as shall be required by Lessor as will properly evidence termination of Lessee's rights hereunder or its interest therein."

The lease also contains a provision pertaining to assignment or subletting:

"30. Lessee shall have the right to sublet all or any portion of the demised premises but shall not assign, transfer or hypothecate this lease without the written consent of Lessor; Lessor agrees that it will not unreasonably withhold such consent. No assignment, subletting or transfer of this lease shall diminish, alter or prejudice the direct and primary liability of Lessee under this lease and the covenants thereof."

On March 5, 1980, Sapolin subleased the premises to Universal Paint Corp. ("Universal"), as part of a sale of various California assets. Universal agreed to perform all Sapolin's obligations under its master lease. The sublease provided that Universal was to occupy the premises from March 8 to July 1, 1980; that from July 1, 1980 to August 15, 1980, Sapolin would have the right of possession; and that subsequent to August 15, 1980, each would have an undivided interest in the premises.

Paragraph 5 of the sublease between Sapolin and Universal originally provided as follows:

"5. *Sub-subletting.* After August 15, 1980, neither Sublessee nor Sublessor will, itself, occupy the Premises, and they will jointly let the Premises to a third party (the 'Sub-Sublessee'). * * * The Sub-Sublease shall be, generally, a 'net' lease for a reasonable term, not extending longer than September 25, 1989, at a fair

market rental rate, under which the Sub-Sublessee shall, except as to rental, agree to perform and be bound by terms, covenants and conditions which are essentially the same as those of the Master Lease."

When it developed during the course of the hearing on Sapolin's right to assign the California Leasehold that Gilbert claimed that this clause disabled Sapolin, or its assignee, from assuring him that the premises would not become vacant or abandoned contrary to Paragraph 17(c) of the master lease, Universal and Sapolin amended Paragraph 5 to read as follows:

> "5. *Sub-subletting.* Sublessee shall use its best efforts to have the Premises sublet to a third party (the 'Sub-Sublessee') from and after August 15, 1980. From and after August 15, 1980, Sublessee may enter the Premises and shall not permit the same to become vacant or abandoned." [2]

At the present time, no sub-subtenant has been found for the premises. To facilitate such sub-subletting, Sapolin and Universal intend to remove all the paint manufacturing equipment and related paint filling and loading equipment from the building in order to make it available for rental for use as general office and warehouse space.

Gilbert, Sapolin's landlord, contends that it will take several months to locate a sub-subtenant for the California property during which it will be vacant or abandoned in violation of the terms of the lease. To support that contention, he called as a witness Mr. Emelyn Williams, a commercial real estate broker, who testified that he has been trying for the past six months, without success, to find an occupant for a building forming part of the same complex as the building leased to Sapolin and which will be available for occupancy beginning November 1, 1980 and also owned by Mr. Gilbert. He has been seeking a tenant willing to pay $2.88 per square foot per year,

the current going rate in Commerce City for industrial property. However, in the opinion of Mr. Williams, no difficulty would be encountered in renting these premises if it were offered at the rate of 75 cents per square foot per year. There are other vacant buildings in the City of Commerce.

Should the Sapolin building become vacant and subject, therefore, to being vandalized, it would adversely affect other property owned by Mr. Gilbert in the same complex.

The building for which Mr. Williams has been trying to find a tenant is less desirable than that leased to Sapolin; the Sapolin building is visible from the thruway, which gives it advertising exposure; it is close to the railroad; and has a more desirable proportion of office-to-warehouse space.

Currently, two or three Sapolin employees are working in the office on the premises. Sapolin and Universal inventory is being stored and shipped from there. Universal employees visit almost daily to draw from that inventory. An electronic alarm system is being maintained. Both Sapolin and Universal intend to continue to maintain inventory there until a sub-subtenant is found. The Sapolin inventory in question belongs to Woolsey and was not included in the sale to Metropolitan.

On July 16, 1980 (after the conclusion of the hearing in this matter), Gilbert sent Sapolin a letter stating that it was terminating the lease under Paragraph 17(c) because of the filing in the bankruptcy court of the Sapolin petition. No other notice of default has ever been sent Sapolin and it knows of no other default under the lease.

The designee of the purchaser of Sapolin's assets is Metropolitan Greetings, Inc. ("Metropolitan"). Metropolitan is engaged in the manufacture and distribution of greeting cards. It is a publicly-held company with 85 percent of its stock being owned by United Capital Corporation. It has a net

---

**2.** The Court, over the objection of counsel for Gilbert, permitted evidence of this amendment to be admitted. Sapolin and those aligned in interest with it argued, and the Court agreed, that there was no deadline respecting what a debtor could do in meeting the requirement that "adequate assurance of future performance" be furnished before a contract can be assigned. 11 U.S.C. § 365.

worth, if its long-term indebtedness to United Capital Corp. is eliminated, of about $800,000. It earned in excess of $190,000 for the fiscal year ending December 31, 1979. In the five-month period terminating May 31, 1980, it earned an additional $185,-000 on sales of $1,157,290. It is projected that in the fiscal year ending December 31, 1980, it will earn approximately $1,000,000. Metropolitan's president has no doubt of its ability to make timely payments of the annual rent of $56,000 called for by the California Leasehold.

## THE RELEVANT PROVISIONS OF THE CODE

Section 365 of the Code, which replaces § 70b (11 U.S.C. § 110b) of the Bankruptcy Act, alters prior law with respect to unexpired leases in several significant ways.

The most important change made by the Code is the denial of enforceability to bankruptcy clauses, i. e., a clause in a lease which permits its termination on resort by the lessee to the protection of the bankruptcy laws. Under the Bankruptcy Act, such clauses were specifically made enforceable:

> "An express covenant that * * * the bankruptcy of a specified party * * * shall terminate the lease or give the other party an election to terminate the same is enforceable." 11 U.S.C. § 110(b).

Section 70b applied to reorganization proceedings as well as to straight bankruptcy. 11 U.S.C. § 702.

By contrast, §§ 365(b)(2) and 365(e)(1) of the Code expressly nullify all bankruptcy clauses by explicitly prohibiting termination of a lease because of a provision conditioned on the insolvency of the debtor, the commencement of a bankruptcy case, or the appointment or taking possession of the property by a "custodian."

Possibly as balance for the denial of the right to terminate because of bankruptcy, the Code contains far more elaborate provisions than did the Bankruptcy Act[3] governing the assumption and assignment of unexpired leases.

Section 365(a) authorizes a trustee, which includes a debtor-in-possession, subject to the Court's approval, to assume any unexpired lease of the debtor. However, if there has been a default in such lease, the trustee, at the time of assumption, must either cure, or provide adequate assurance that the trustee will promptly cure such default. § 365(b)(1). Having assumed an unexpired lease, the trustee or debtor-in-possession is authorized to assign it, if there is provided "adequate assurance of future performance by the assignee." § 365(f)(2)(B).

The phrase "adequate assurance of future performance" is new and was not to be found in the Bankruptcy Act.

## THE PROCEEDINGS HEREIN

No rules have yet been promulgated governing the procedure either for court approval of the assumption of an unexpired lease, or for determining whether adequate assurance of future performance has been provided.[4]

---

**3.** Section 70b so far as relevant provided:

"The trustee shall assume or reject an executory contract, including an unexpired lease of real property, within sixty days after the adjudication or within thirty days after the qualification of the trustee, whichever is later, but the court may for cause shown extend or reduce the time. Any such contract or lease not assumed or rejected within that time shall be deemed to be rejected. * * * A general covenant or condition in a lease that it shall not be assigned shall not be construed to prevent the trustee from assuming the same at his election and subsequently assigning the same; but an express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same is enforceable. A trustee who elects to assume a contract or lease of the bankrupt and who subsequently, with the approval of the court and upon such terms and conditions as the court may fix after hearing upon notice to the other party to the contract or lease, assigns the contract or lease to a third person, is not liable for breaches occurring after the assignment."

**4.** House Report No. 95–595 identifies both as areas which it is expected will be covered by new bankruptcy rules. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 295 (1977), U.S.Code Cong. & Admin.News, 1978, p. 5787.

The debtors in this proceeding elected to proceed, as has already been noted, by order to show cause. After counsel for Gilbert indicated that he was opposing assignment on the ground that the lease was in default, the Court directed him to state the defaults claimed. He responded by saying that the lease requires that the premises be occupied; that they were being occupied by the debtor Sapolin "with the sole purpose of selling their equipment and that by August 15, 1980 the building will be vacant"; that Sapolin and its subtenant, Universal Paint Corporation, will not be occupying the premises after August 15, 1980; and that the landlord will be damaged if the property becomes vacant and subject to vandalism.

At the evidentiary hearing on July 1, 1980, counsel for the landlord introduced documentary and testimonial evidence in support of his objection to the assumption and assignment of the lease. At the conclusion of this evidence, the Court held that no evidence of any existing default had been presented, but that sufficient evidence had been introduced to raise a question as to whether the debtor could give adequate assurance of future performance. On July 2, 1980, evidence was introduced by the other interested parties. No rebuttal evidence was adduced by the landlord.[5]

Gilbert now claims that the lease is in default because the nature of its current occupancy failed to satisfy the requirement that the property not be left "vacant or abandoned"; that Sapolin is also in default because of its recourse to relief under the bankruptcy laws; and that the proposed assignee is incapable financially of providing adequate assurance of future performance. He also contends that his right to terminate the lease under its bankruptcy clause is a valuable property right which § 365 takes away in violation of the Fifth Amendment. He, therefore, challenges the constitutionality of §§ 365(b)(2) and 365(e)(1) of the Bankruptcy Code as applied to his lease.[6]

For the reasons hereinafter set forth, the Court rejects the objections of the landlord to the assumption and assignment of the lease. In the view of the Court, the requirements of § 365 have been satisfied and Sapolin may properly both assume and assign to Metropolitan the California Leasehold.

## DISCUSSION

What is involved here is an enormously valuable asset. If Gilbert can terminate the lease which Sapolin bought in 1977, he will realize a windfall in excess of $1,000,000. The difference between the rent called for in the California Leasehold, 81 cents per square foot, and the rentals currently prevailing in the area where the building is located, $2.88 a square foot, is more than $2.00 a square foot. Since the building contains about 69,000 square feet, the difference is approximately $138,000 per year. Over the remaining life of the lease, disregarding the value of the option to renew for an additional ten years, the difference exceeds $1,000,000. In an arm's-length deal, the parties have assigned a value of $230,000 to a half interest in the lease.

## II.

Up to the time Sapolin gave notice of its intention to assign the lease, the landlord

---

5. The landlord sought and was denied an adjournment to call as a witness, or to take the deposition in California of, a representative of Universal Paint Corp. (pp. 419–420, *infra*).

6. Although the constitutionality of the Bankruptcy Code has been challenged, neither the party raising that challenge, nor anyone else, requested the Court to certify that fact to the Attorney-General pursuant to 28 U.S.C. § 2403, nor gave the notice required by General Rule 24 of the General Rules of the Eastern District. This is in contrast with the procedure in *Wallach v. Lieberman*, 366 F.2d 254, 257 (2d Cir.

1966). When, on the eve of decision, the Court first became aware of the oversight regarding certification, it decided to proceed, nevertheless, because of the prejudice to substantial interests that was likely to arise from further delay. Weighing into that decision were the fact that the Court deems the constitutional issue to be insubstantial, and the Attorney-General will have ample opportunity to participate and be heard in the event that an appeal is taken to the District Court. (A copy of this Opinion is being sent the Attorney-General.)

claimed no default. Even as of today, the only claimed default, as to which the landlord has served formal notice, as required under Paragraph 17(c) of his lease, is the filing by Sapolin of a petition under Chapter 11.

■ The claim that the building is now "vacant or abandoned" because it is being used only by a few individuals is inconsistent with the landlord's acceptance of Sapolin's and Universal's performance up until now. No doubt, the landlord has claimed no default to date because a building in which inventory is stored, in which people work, and which is protected by an alarm system, is neither vacant, nor abandoned, in the ordinary meaning of those terms. But even if it were, the landlord would appear to have waived the right to claim default by his past inaction. *Salton Community Services Dist. v. Southard*, 256 Cal.App.2d 526, 533, 64 Cal.Rptr. 246 (1967) (and cases cited therein); 30 Cal.Jur.2d § 285 at 430–32. *See, also, B.J.M. Realty Corp. v. Ruggieri*, 338 F.2d 653 (2d Cir. 1964); *Geraghty v. Kiamie Fifth Avenue Corp.*, 210 F.2d 95 (2d Cir. 1954); *In re Wil-low Cafeterias Inc.*, 95 F.2d 306 (2d Cir. 1938); *Model Dairy Co., Inc. v. Foltis-Fischer, Inc.*, 67 F.2d 704 (2d Cir. 1933). At the very minimum, under California law, Sapolin would be entitled to notice and an opportunity to remedy the claimed default before losing a valuable lease. *McFadden v. Walker*, 5 Cal.3d 809, 97 Cal.Rptr. 537, 488 P.2d 1353 (1971).

■ Finally, the Court is of the opinion that the failure of the landlord to advise Sapolin that it was claiming a default on this ground when the Court directed the landlord to state in advance all its objections to the assumption and assignment of the lease estops it from now doing so.

■ Accordingly, the Court finds that there is no default in the California leasehold which Sapolin is required to cure under § 365(b)(1) before assuming and assigning the California Leasehold.

## III.

However, before Sapolin can assign the lease it has assumed, the Code requires that the landlord be provided with "adequate assurance of future performance." This meant, according to Gilbert, that he is entitled to adequate assurance that the building will not become "vacant or abandoned," and that Sapolin could not provide such assurance because of its contract with Universal, which originally precluded both from occupying the premises after August 15, 1980 and committed them to finding a sub-subtenant. Gilbert contended that there could be no assurance that such a sub-subtenant will be found. As proof of the difficulty of obtaining tenants for property like that here involved, he relied on his expert's uncontradicted evidence regarding the inability of a real estate agent to locate a tenant for a similar building in the same general area.

### A.

But the cornerstone of this argument was destroyed when Universal and Sapolin, in order not to jeopardize a valuable asset in which they were jointly interested, agreed that if the premises could not be sublet, Universal would enter them so as to prevent them from becoming "vacant or abandoned."

Even if Universal and Sapolin had not so explicitly modified their agreement, it could have been anticipated that some such solution would have been reached to avoid destroying the value of property they held jointly. The provision of their agreement committing them to sublease the premises to a third person, rather than occupy them themselves, was obviously intended to permit both to benefit from a valuable leasehold; if the provision had had the unintended consequence of destroying that leasehold, it would quickly have been altered, as, in fact, it was.

After Sapolin and Universal altered their sublease to permit Universal to become, in effect, a tenant of last resort, Gilbert sought to adjourn the hearing to permit him to examine Universal to ascertain its

ability to keep the premises from becoming vacant or abandoned. The Court denied the application because Universal is now simply part of the universe of potential sub-subtenants through which Metropolitan can satisfy whatever obligation the lease imposes to keep the California premises from becoming vacant or abandoned. Moreover, the landlord evidently has already accepted Universal's performance for the period from March 5, 1980 to July 1, 1980; there seems no reason now to question its ability to perform in the future.

### B.

Indeed, Gilbert's argument builds on a faulty premise. Even if Sapolin and Universal had kept their sublease unaltered, Gilbert could not prevail. The Court does not agree that laying the Bankruptcy Code beside the California Leasehold, Gilbert is entitled to assurance that the premises will not become "vacant or abandoned."

What the Code requires is that the lessor be given the performance for which he has contracted. Examination of Sapolin's lease shows that nowhere has Sapolin promised not to permit the premises to become vacant or abandoned.

Section 17 creates a condition subsequent, a conditional limitation on the lease, not a covenant to be performed. The lessee has not covenanted in Section 17 of the lease not to vacate or abandon the property; what the lessee has done is give the landlord the right to reenter and terminate the lease if such a condition occurs. The landlord cannot insist that the bankruptcy law gives him what the lease does not, which is assurance that the lessee will not bring about the condition which entitles the landlord to premature termination of the lease.

■ The distinction between a "covenant" and a "condition subsequent" is well-established in the law. *Hale v. Finch*, 104 U.S. 261, 26 L.Ed. 732 (1881); *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir. 1963); 5 Williston, Contracts, § 665 (3d Ed.); Restatement of the Law, Contracts, § 251. "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Restatement, Contracts, § 251. "A condition creates no right or duty of and in itself, but is merely a limiting or modifying factor." *United States v. Schaeffer, supra*, at 911.

Indeed, as long as the landlord has the right to reenter and terminate the lease upon the property becoming vacant or abandoned, a right which in no way will be diminished by the assignment of the lease, he would seem to have all that he has bargained for, which is all that the Code could have been intended to provide.

### C.

But even if the lease could be read as creating an obligation not to permit the property to become vacant or abandoned, assignment should be permitted.

■ The terms "adequate assurance of future performance" are not words of art; the legislative history of the Code shows that they were intended to be given a practical, pragmatic construction.

The phrase first appears in the legislation proposed by the Commission on Bankruptcy Laws. In the Commission's proposed bill, "adequate assurance of future performance" was to be required only where executory contracts, not unexpired leases, were to be assigned.

The Commission Report explains the language "adequate assurance of future performance" as follows:

"The language 'is adopted from Uniform Commercial Code § 2–609(1).' What constitutes 'reasonable time thereafter' for curing defaults or an 'adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption. Cf. Official Comment 4 To Uniform Commercial Code § 2–609 (1972 Edition). It is not intended, however, that any non-debtor party should acquire greater rights in a case under the act then he has outside the act." Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. Pt. II 156–57 (1973).

■ Section 2–609 of the Uniform Commercial Code, from which the bankruptcy statute borrows its critical language, provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance * * *." The Commentaries to the Code note that " 'adequate' assurance is to be 'defined by commercial rather than legal standards.' " Official Comment 3 To Uniform Commercial Code § 2–609 (1972 Ed.). What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious.

What are the factual conditions here? Is there any likelihood that Sapolin's assignee will fail to find a tenant, or that, should it fail to so, it will permit the premises to become vacant or abandoned and thus forfeit $1,000,000 property?

In a market in which the prevailing rate is $2.88 per square foot, how can Sapolin's assignee fail to find a tenant when any rental in excess of 81 cents per square foot will produce a profit? Gilbert's fear is not realistic; he is seeking to use the legislative concern that landlords be fully protected to bring about precisely the kind of windfall that the statute was intended to prevent.

The economic conditions that tempt Gilbert to question his protection against the possibility that his property will be vacated and abandoned sometime in the indefinite future provide the best assurance that this will not occur. Gilbert should not be permitted to work the forfeiture of a valuable asset of the debtor on the basis of chimerical possibilities.

■ "The bankruptcy court does not look with favor upon forfeiture clauses in leases. They are liberally construed in favor of the bankrupt lessee so as not to deprive the estate of property which may turn out to be a valuable asset." *Finn v. Meighan*, 325 U.S. 300, 301, 65 S.Ct. 1147, 1149, 89 L.Ed. 1624 (1945).

■ Taking into consideration all the facts of the proposed assumption, there is present here adequate assurance of future performance of the terms of the California Leasehold.

## IV.

Gilbert's remaining contention is that his contractual right to terminate the California Leasehold because of Sapolin's resort to Chapter 11 is a property right of which he cannot constitutionally be deprived.

Before addressing that contention, it may be desirable to dispose of two threshold issues which those opposing Gilbert have raised. It has been suggested that none of the conditions precedent to the landlord's right to terminate under its bankruptcy clause have occurred. The Court disagrees. Although the bankruptcy clauses in the California Leasehold fail to describe the precise type of relief under the bankruptcy law of which Sapolin has availed itself, it clearly was the intention of the parties to encompass any resort to the bankruptcy laws and the Court so interprets it. *Finn v. Meighan, supra*, 325 U.S. at 303–04, 65 S.Ct. at 1149–50; *In re Walker*, 93 F.2d 281, 283 (2d Cir. 1937).

Nor does it signify that notice to terminate pursuant to the bankruptcy clause was not sent until after this proceeding started and after the hearing on Sapolin's application to assume and assign the California Leasehold. Apparently, Gilbert only learned as a result of the order to show cause that Sapolin had applied for relief under Chapter 11. He then acted promptly to enforce his rights under the bankruptcy clause. Consequently, he has not waived those rights. (Whether by doing so he violated the automatic stay imposed by § 362 of the Code is a question which the Court is not now considering.)

■ The issue, then, before the Court is whether Gilbert may constitutionally be denied the right created by the terms of the lease with Sapolin to terminate that lease if that company should avail itself of the

bankruptcy laws, as it has done. The answer to that question would appear to be clearly "Yes," and to have been settled over thirty years ago.

In 1946, in *Smith v. Hoboken Railroad & S. S. Connecting Co.*, 328 U.S. 123, 133, 66 S.Ct. 947, 953, 90 L.Ed. 1123 (1946), the Supreme Court sustained the power of Congress to deny enforcement to a lease termination clause and thereby "prevent enforcement of the engagements of the debtor pursuant to their terms." In that landmark decision, the Supreme Court denied enforceability as against a bankruptcy trustee of an express covenant of forfeiture in a lease. The Court found that enforcement of such a clause in a railroad reorganization proceeding would be inconsistent with Federal policy as expressed in the Interstate Commerce Act and in the applicable section of the bankruptcy law, § 77. The Court held that it was not obliged to apply § 70b of the Bankruptcy Act (11 U.S.C. § 110b) which allowed the enforcement of forfeiture clauses because § 77, sub. 1 made that provision applicable only if "consistent with the provisions" of § 77 which, in the words of the Court, "is aimed at keeping railroad properties intact so that reorganization plans may be worked out and disintegration of transportation systems prevented." 328 U.S. at 127, 66 S.Ct. at 950. Analyzing Congressional policy as expressed in the Interstate Commerce Act and in § 77, the Court held that it would be inconsistent with the legislative design to permit enforcement of the lease forfeiture clause. It reversed both courts below which had held the lease of certain land to a railroad company involved in a reorganization proceeding to be forfeited. The Court's opinion concludes:

"The point is that if the reorganization court decrees a forfeiture in advance of consideration of the problem by the [Interstate Commerce] Commission, it interferes with the functions entrusted to the Commission under § 77. * * * If forfeiture of leases can be decreed without prior reference of the matter to the Commission, it may be seriously embarrassed in preparing the plan which it deems nec-essary or desirable for the reorganization of the debtor. The Federal policy embodied in § 77 can prevent enforcement of the engagements of the debtor pursuant to their terms." (Footnotes omitted.) 328 U.S. at 132–33, 66 S.Ct. at 953.

*Smith* establishes two principles, both relevant here: First, lease forfeiture clauses need not necessarily be enforced by courts of bankruptcy; second, such enforcement may be denied as a matter of legislative policy.

The first principle became the basis for a series of decisions by the lower Federal courts denying enforcement to bankruptcy clauses as a matter of equity. *In re Fleetwood Motel Corp.*, 335 F.2d 857 (3d Cir. 1964); *Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972), *cert. denied*, 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1973); *Queens Boulevard Wine & Liquor v. Blum*, 503 F.2d 202 (2d Cir. 1974); *In re Fontainebleau Hotel*, 515 F.2d 913 (5th Cir. 1975); *Matter of M&M Transportation*, 437 F.Supp. 821 (S.D.N.Y.1977).

In *In re Fleetwood Motel Corp., supra*, at 862, the Third Circuit held "that the rationale of *Smith*, coupled with the inherent powers of a court of bankruptcy," provided abundant support for the refusal of a referee in bankruptcy in a Chapter X proceeding involving a large hotel to enforce a standard bankruptcy clause. The Fourth Circuit reached the same conclusion in *Weaver v. Hutson, supra*.

The Second Circuit followed in *Queens Boulevard Wine & Liquor v. Blum, supra.* There, the court upheld the bankruptcy court's refusal to enforce a conditional limitation in a commercial lease which authorized the landlord to terminate the lease in the event the tenant filed a petition under Chapter XI. The landlord, which had received an offer to lease the store at a higher rent, sought to regain possession under the terms of its lease. In affirming the lower courts in refusing to permit such termination, the Second Circuit said it found persuasive those cases "which hold a lease termination provision to be unenforceable

when compelling equitable and policy considerations so require."[7]  503 F.2d at 206. Weighing the equities in the case, the court concluded that it would be inequitable to enforce the bankruptcy clause, saying:

> "In determining whether to enforce the lease termination here, therefore, we must consider not only the interests of the landlord but also those of the debtor and its creditors.  Possession by Queens will not prejudice Carol [the landlord], which is protected by a sizeable security deposit, except to deny it a windfall in the form of increased rent to which we hold it is not equitably entitled."  503 F.2d at 206.

In *In re Fontainebleau Hotel Corp., supra,* the Fifth Circuit aligned itself with the Second, Third, and Fourth Circuits which, following *Smith,* had declined to order the forfeiture of possession under a lease for breach of a bankruptcy clause.

Although it is true, as Gilbert points out, that none of these courts explicitly addressed the constitutional issue which he now raises, if that constitutional issue had any substance, it would not have been decided, as it was, *sub silentio.*

Gilbert's challenge to constitutionality rests on the premise that the right to terminate a lease is a property right which cannot be destroyed without violating the Fifth Amendment's prohibition on the taking of property without due process of law.  He grounds his claim that what is here involved is a property right on language to be found in a Third Circuit decision, *In re Technical Marine Maintenance Co.,* 169 F.2d 548 (3d Cir. 1948) and in a concurring opinion in *Smith v. United States,* 362 F.2d 366 (9th Cir. 1966).  But whether a lessor can constitutionally be denied the right to enforce a provision permitting him to terminate a lease prematurely must be determined not in light of how the courts have happened to describe such a right, but how they have treated its denial.  Despite the Third Circuit's characterization of the landlord's right of reentry as a property right, it was that court which led the way in refusing to enforce a lease forfeiture clause where it was inequitable.  The court explicitly found *In re Technical Marine Maintenance Co.* to be no impediment to denying such enforcement.  *In re Fleetwood Motel Corp.,* 335 F.2d at 862.

█  "Bankruptcy proceedings constantly modify and affect the property rights established by state law."  *Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 517, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490 (1938).  The power given Congress by Article I, Section 8, of the Constitution to establish uniform laws relative to bankruptcy gives it broad latitude to effect both contract and property rights.  *Wright v. Union Central Life Ins. Co., supra; Kuehner v. Irving Trust Co.,* 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937);  *Continental Illinois National Bank & Trust Co. v. Chicago-Rhode Island P. R. Co.,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

Stripped to its essentials, what Congress has done here is deprive the landlord of a windfall he could have claimed under former § 70b when his lessee's bankruptcy gave him the right to terminate prematurely a valuable lease.  In refusing to let such consequences attach to the mere filing of a petition for relief under the bankruptcy laws, and by laying down as a rule of law that a landlord who is otherwise receiving, and will receive, full performance under his

---

7. The court, while relying on *Fleetwood* and *Weaver v. Hutson,* which were based on *Smith,* did not itself invoke *Smith* as authority, an omission which was patently deliberate since *Smith* occupied a prominent place in the dissenting opinion which cited *Smith* as carving out an exception to the enforcement of bankruptcy clauses only where enforcement would run contrary to a strong public interest.  Obviously, no strong public interest was present in a case involving one small local liquor store.  It may well be that the majority in *Queens Boulevard* agreed with this reading of *Smith* as creating an exception only for cases involving a strong public interest and, therefore, preferred to place its decision on the powers of a court of equity to carve out other exceptions, as well.  For the purposes of this case, the significant fact is that the Second Circuit in *Queens Boulevard* no more found itself constrained to recognize a bankruptcy clause than had the Supreme Court in *Smith.*

lease, may not declare a forfeiture, Congress has not exceeded its constitutional powers.

All that Congress has done in § 365 is to codify and make universal what courts of bankruptcy have been doing on an *ad hoc* basis pursuant to their general equity power. Congress has laid down a rule of general application; it has declared that in all bankruptcy cases, where the lessor has received and is ensured full performance, he may not terminate the lease because of the intervention of bankruptcy.

The second principle to be extracted from *Smith* is relevant here, and that is that Congress may by legislation deny enforcement to a bankruptcy clause.

If enforcement of a forfeiture clause can be denied, as it was in *Smith*, because of Federal policy, as indirectly expressed in the relevant statutes, so, equally, may it constitutionally be refused pursuant to the clear and explicit statement of legislative policy, as incorporated into § 365 of the Bankruptcy Code. To paraphrase the language of the Supreme Court in *Smith* (328 U.S. at 133, 66 S.Ct. at 953), by substituting § 365 for the reference to § 77: The federal policy embodied in § 365 can prevent enforcement of the engagements of the debtor pursuant to their terms.

### CONCLUSIONS OF LAW

As a debtor-in-possession, Sapolin may assume the California Leasehold. There has been no default in that lease within the meaning of § 365(b)(1) of the Bankruptcy Code, 11 U.S.C. § 365. Such assumption has the approval of the Court.

Gilbert has been provided with adequate assurance of future performance of the California Leasehold and Sapolin, as a debtor-in-possession, is entitled, under § 365 of the Bankruptcy Code, to assign the lease.

The invalidation of the bankruptcy clauses in the California Leasehold by the Bankruptcy Code does not violate the Fifth Amendment.

Sapolin, as a debtor-in-possession, has properly assumed and may assign the California Leasehold to Metropolitan.

An Order consistent with this Opinion is being entered simultaneously herein.